**CITY LUMBER CO. et al.**

v.

**UNITED STATES.**

R. D. 11557; Reappraisement R62/3973 etc.

United States Customs Court.
July 9, 1968.

Barnes, Richardson & Colburn, New York City (Norman C. Schwartz and Rufus E. Jarman, Jr., New York City, of counsel), Frank G. Parker, New York City, associate counsel, for plaintiffs.

Edwin L. Weisl, Jr., Asst. Atty. Gen., (Charles P. Deem and Sheila N. Ziff, New York City, trial attorneys), for defendant.

Covington & Burling, Washington, D. C. (Donald Hiss, Washington, D. C., of counsel), as amicus curiae.

WILSON, Judge:

The three appeals enumerated in the schedule attached hereto and made a part hereof were consolidated for purposes of trial. The imported merchandise consists of gray portland cement invoiced as "LIZ" brand complying with specifications ASTM C 150/56, Type 1. The cement in the first two appeals was exported from Portugal on May 7, 1960, and June 9, 1960, respectively, and was entered at Bridgeport, Conn. for the account of City Lumber Co. The cement in the third appeal was exported from Portugal on August 1, 1960, and was entered at Philadelphia, Pa., for the account of Port Everglades Steel Corp.

The appraisers at both ports of entry appraised the cement at values under section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165. The appraisers also reported the unit foreign market values on the respective dates of purchase, as well as the unit purchase prices under the Antidumping Act of 1921 (hereinafter ADA), sections 205 and 203, as amended (19 U.S.C. § 160(a) (c)), as amended by the Customs Simplification Act of 1954, 89 Treas. Dec. 242, T.D. 53599, respectively, which resulted in special dumping duties under section 202(a) of the Antidumping Act. This was done after the United States Tariff Commission (hereinafter referred to as the Commission) issued its "Determination of Injury," TC Publication 37, AA 1921–22 dated October 20, 1961, more particularly referred to infra. The Treasury Department on October 31, 1961, pursuant to section 201(a) made public its finding of dumping (26 F.R. 10476).

### STATUTES AND REGULATIONS INVOLVED

Section 201 of the Antidumping Act, 1921, as amended (19 U.S.C. § 160):

Initiation of investigations; injury determination; findings; withholding appraisement; publication in Federal Register

(a) Whenever the Secretary of the Treasury (hereinafter called the "Secretary") determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States or elsewhere at less than its fair value, he shall so advise the United States Tariff Commission, and the said Commission shall determine within three months thereafter whether an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation of such merchandise into the United States. The said Commission, after such investigation as it deems necessary, shall notify the Secretary of its determination, and, if that determination is in the affirmative, the Secretary shall make public a notice (hereinafter in sections 160–173 of this title called a "finding") of his determination and the determination of the said Commission. For the purposes of this subsection, the said Commission shall be deemed to have made an affirmative determination if the Commissioners of the said Commission voting are evenly divided as to whether its determination should be in the affirmative or in the negative. The Secretary's finding shall include a description of the class or kind of merchandise to which it applies in such detail as he shall deem necessary for the guidance of customs officers.

\* \* \* \* \* \*

(c) The Secretary, upon determining whether foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and the United States Tariff Commission, upon making its determination under subsection (a) of this section, shall each publish such determination in the Federal Register, with a statement of the reasons therefor, whether such determination is in the affirmative or in the negative. May 27, 1921, c. 14, § 201, 42 Stat. 11;

Sept. 1, 1954, c. 1213, Title III, § 301, 68 Stat. 1138; Aug. 14, 1958, Pub.L. 85–630, §§ 1, 4(b), 72 Stat. 583, 585.

19 CFR (revised as of January 1, 1961) Part 201—United States Tariff Commission, Rules of General Application:

§ 201.7 [page 569] Methods employed in obtaining information.

(a) *Questionnaires, correspondence, and field work.* In obtaining information necessary to carry out its functions and duties, the Commission may employ any means authorized by law. It is the practice of the Commission to obtain much of its information through the use of questionnaires and correspondence, and through field work by duly authorized members of the Commission's staff who interview such manufacturers, farmers, distributors, importers, representatives of labor, consumers, and others, as may be necessary to obtain the required information. Official requests for information required by the Commission are made either in writing or orally, and responses are received either in writing or orally, depending upon the nature of the information requested and the use to be made of it.

\* \* \* \* \* \*

(c) *Formal hearings.* In formal proceedings, the Commission obtains information from the evidence presented at hearings as well as through independent investigation by the Commission and its staff of experts. [14 F.R. 7289, Dec. 6, 1949, as amended at 16 F.R. 10625, Oct. 18, 1951]

Part 208—Investigations of Dumping Injury to Domestic Industry:

§ 208.1 [page 582] Applicability of rules regarding investigations under section 201(a) of the Antidumping Act, 1921, as amended.

The rules under this part are specifically applicable to investigations for the purposes of section 201(a) of the Antidumping Act, 1921, as amended, and apply in addition to the pertinent rules of general application set forth in Part 201 of this chapter.

The plaintiffs contend that the majority of the Commission acted upon an erroneous theory of law and in clear violation of statutory power to "lay and collect duties" delegated to it by Congress under Article 1, Section 8, of the Constitution; that the only question is whether the finding of "injury" by the majority was an exercise of duly conferred authority, or was *ultra vires* and, therefore, null and void, because based upon an incorrect interpretation of law; that the Commission exceeded its statutory authority by predicating its finding of "injury" almost entirely upon importations of cement from countries *other* than Portugal (brief, page 2). Plaintiffs' proposed finding of fact No. 6 (brief, page 20) states that "The sole question herein is the validity of the investigation and determination of the Tariff Commission." Plaintiffs' counsel stated at R.2,3:

\* \* \* we are not claiming any other or different foreign market value[s] or purchase price[s] than as found by the Appraiser. Our contention is, rather, that the investigation conducted by the Tariff Commission was illegal since importations from other countries than Portugal were considered in the Commission's report.

Accordingly, the *values* found by the appraisers under the tariff act and the *values* and *prices* reported under the Antidumping Act are conceded correct as to the *amounts* thereof.

The defendant contends that the Tariff Commission and the Assistant Secretary of the Treasury acted within the authority delegated by the Congress in finding that an industry in the United States was being injured by the sale of portland gray cement imported from Portugal (brief, page 15, "PROPOSED CONCLUSIONS OF LAW" number 2).

The only evidence in this case is plaintiffs' collective exhibit 1 which consists of a record certified by Donn N. Bent, Secretary of the United States Tariff

Commission, dated April 20, 1966. It is "the complete official record in the investigation which the Tariff Commission conducted under section 201(a) of the Antidumping Act of 1921, as amended, on PORTLAND CEMENT FROM PORTUGAL NO. AA1921–22." That official record contains many items including a letter dated July 17, 1961, from the Assistant Secretary of the Treasury to the Commission; notices of the Commission of the investigation issued July 24, 1961, and of the hearing issued August 1, 1961; tentative calendar for the hearing; transcript of the oral record made at the hearing held September 14, 1961, before the Commission, as well as other documents including a statement submitted on behalf of the City Lumber Co. and another on behalf of the Portuguese exporter of the involved cement; a brief submitted for Port Everglades Steel Corp. by its counsel; a brief submitted for 12 representative domestic cement producers by their counsel; brief of Foreston Coal Co., Inc., of Massachusetts, submitted by its counsel; and a "Determination of Injury" issued by the Commission, dated October 20, 1961, which is "TC Publication 37" of three Commissioners and the "Views of Commissioners Talbot and Overton." As deemed necessary herein, such of the foregoing items will be referred to infra.

Gleaned from this evidence is the fact that the Treasury letter to the Commission of July 17, 1961, was received on July 20, 1961, which advised under section 201(a) (19 U.S.C. § 160(a) of the ADA, as amended, "that portland gray cement from Portugal is being, or is likely to be sold in the United States at less than fair value as that term is used in the Antidumping Act."

On July 24, 1961, the Commission issued a "Notice of Investigation" (26 F.R. 6792) which notice states that it received advice from the Treasury Department that "PORTLAND GRAY CEMENT from PORTUGAL is being, or is likely to be, sold in the United States at less than fair value," to "determine whether an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation of such merchandise into the United States." Interested parties were requested to submit written statements of pertinent information to the Commission.

On August 1, 1961, the Commission issued a "Notice of Hearing" (26 F.R. 7026) scheduled for September 14, 1961, wherein interested persons were requested to appear and be heard. A hearing was held before the Commission on the latter date at which time the oral testimony was adduced of representatives of 12 domestic producers of cement; Portuguese Cement Mills, New York, N. Y.; City Lumber Co.; Port Everglades Steel Corp.; and Foreston Coal Company of Massachusetts. This latter firm is not a party in the instant case but its treasurer testified herein that his firm imported cement from Portugal in two shipments which either arrived or were shipped therefrom in May 1960 and the beginning of August 1960 (Tr. 97). This is close to the periods of exportation in the cases at bar and is prior to the hearing before the Commission on September 14, 1961. Those two shipments were received at Fall River, Mass., from which port he sold (Tr. 99, 100). The certified transcript of the record made before the Commission contains 182 pages. In addition to the oral testimony, statements and briefs on behalf of interested parties as noted, supra, and other documents were received in evidence by the Commission.

On October 20, 1961, the Commission issued its "Determination of Injury," TC Publication 37, AA1921–22 on "PORTLAND CEMENT FROM PORTUGAL," referred to supra. This document asserts that, in arriving at a determination, due consideration was given by the Commission to all written submissions from interested parties; all testimony adduced at the hearing and all factual information obtained by the Commission's staff; that on the basis of the investiga-

tion the Commission [majority of three Commissioners] has determined (Commissioners Talbot and Overton dissenting), "that an industry in the United States is being injured by reason of the importation of portland gray cement from Portugal at less than fair value within the meaning of the Antidumping Act, 1921, as amended." On October 31, 1961, pursuant to section 201(a) (c) of the ADA the Assistant Secretary of the Treasury made public the finding of dumping of portland gray cement imported from Portugal (26 F.R. 10476).

Thereafter, on February 16, 1962, the appraiser at Bridgeport, Conn., made his returns of values and prices and on February 13, 1962, the appraiser at Philadelphia, Pa., did likewise (see appraiser's returns on the "Summary of Examination and Appraisement" forms in the cases at bar).

The "Majority Statement of Reasons" states that in this investigation the Commission is confronted with one of a series of investigations respecting imports of such cement under similar circumstances from a succession of foreign supplying countries; that three United States importers are currently involved. One handled transactions in 1958 for an importer of cement from *Sweden* that had been sold at less than fair value by Swedish exporters, which resulted in a determination of injury as "substantial quantities of such cement have been sold and continue to be sold in the 'competitive market area' at prices which forced the domestic producers to lower their prices of like domestic cement below those that prevailed prior to the sales of Swedish cement at less than fair value." (Note said determination of injury is dated April 4, 1961 [AA1921–16] and was published in 26 F.R. 3427. It is reproduced as appendix A part of the defendant's brief.) The competitive market consisted of Rhode Island, eastern Massachusetts and eastern Connecticut. The imports of Portuguese cement involved in the case at bar are entering at Bridgeport, Conn., Fall River, Mass., and

Trenton, N. J., and are sold in limited geographical areas that are supplied with domestic cement by plants adjacent to the same areas. (See page 5 of TC Publication 37.)

The majority statement also states that all three United States importers of Portuguese cement currently involved were responsible in 1959 for entries of portland cement from *Belgium* that had also been sold in the United States at less than fair value; that one of them sold such cement under circumstances that caused the Commission to make a determination of injury (dated June 2, 1961, AA1921–19, published in 26 F.R. 6511 and reproduced as appendix B, part of defendant's brief) as the industry concerned is adjacent to the same area where imports were entered at the ports of Port Everglades, West Palm Beach, Fort Pierce, Port Canaveral, and Jacksonville, Fla. The industry there concerned "has lost a substantial volume of sales of such cement in such areas, which loss is directly attributable to the price of the imported cement made possible by reason of its sale at less than fair value by the exporters." (See page 2 of TC Publication 37.) The majority statement, page 3, states—

Spokesmen for the importers contended that although the imported cement from Portugal was sold at prices below fair value such sales had had no depressive impact on the prices then prevailing in the respective domestic marketing areas and therefore had occasioned no injury to domestic producers. Sellers of Portuguese cement, it was argued, merely "met" the prices already prevailing in the respective areas; they said, "There is no evidence in this case (unlike the Swedish case) that Portuguese cement was specifically responsible for any price break." This reasoning appears to us to be more ingenious than tenable. To embrace this conclusion, one must overlook the fact that the prices thus "met" in the region affected had already been depressed by earlier imports of dumped merchandise from

countries other than Portugal. One must also disregard the hammering effect, and threat of additional sales thereafter below fair value of imports from new sources of supply—including those from Portugal—brought into play after avenues of dumping already utilized had been closed by enforcement of the antidumping statute. Depressed prices kept depressed by recourse to new forms of the old depressant constitutes, for the domestic producers, merely a prolongation of the very injury from which it was hoped they had already gained relief.

At page 4 the majority statement states—

> \* \* \* We must conclude, therefore, that with the purpose of dumping already having been accomplished in the U.S. market, the resultant depressed prices leave little consolation to the domestic industry forced to meet such prices and thereby compelled to suffer continued injury if it wishes to compete. A denouement of such character was never the purpose of the Antidumpting Act, and such procedure meets neither the letter nor the spirit of the act.

At pages 5 and 6 the majority statement states—

> Portland cement is a standardized or fungible product the sale of which in a given market is generally contingent upon its cost not being higher than the cost of like competitive cement. It is a heavy, low-valued product which, by reason of transportation costs, can be sold economically only to users located within a relatively short distance from the cement plants (or port of entry for imported cement). The imports of Portuguese portland cement which are injuring the domestic industry concerned are entering at Bridgeport, Conn., Fall River, Mass., and Trenton, N. J., and are being sold in limited geographical areas that are supplied with domestic portland cement by

> plants adjacent to the same areas. These areas are referred to herein as the "competitive market areas." The domestic portland cement plants that have supplied such cement in these areas and have in recent years sold substantial quantities of such cement there are considered to constitute "an industry" for the purposes of the Antidumping Act.

■ An examination of the voluminous record discloses substantial evidence in support of the facts set forth in the majority statement as noted in the foregoing quoted portions thereof.

The views of the minority assert that no industry in the United States is being or is likely to be injured by reason of the importation of portland gray cement from Portugal sold for export to the United States at less than fair value; that whether injury or likelihood thereof to a domestic industry exists from the importation of Portuguese cement "involves evaluation of facts obtained in the investigation relating to imports of such cement from this source only and their economic impact upon a domestic industry"; that there is no likelihood of injury by future importations of portland gray cement from Portugal as "the Commission has received assurances from the foreign producer involved, as well as from the importers concerned, that further [future] shipments of this product from Portugal to the United States would be made, if at all, only if they met the 'fair value' criteria of the Treasury Department." (TC Publication 37, pages 6 to 8.)

These views of the minority seem to hinge upon whether the imports of cement from Portugal *alone, create an injury* (present tense) *in themselves*. This overlooks the fact that cement imported from Sweden (where imports of cement were made in almost the identical competing home market as the current Portuguese imports) and from Belgium, as referred to, supra, had caused *injury* to domestic producers in their respective

importing areas because such foreign sales were being made at less than fair value. It also overlooks the important fact that Portuguese cement *is* sold at prices which "met" the aforesaid less than fair value prices *that caused injury because domestic producers were obliged to reduce their former prices to meet such imported prices.* Where two things are equal to a third, then the two things are equal to each other. This is axiomatic. Thus, the less than fair value prices of cement from Sweden, Belgium, and Portugal accomplish the same disastrous result of injury to the domestic trade in respective market areas.

Alleged assurances that *future* imports of cement from Portugal would meet the "fair value" criteria of the Treasury Department is speculative and hypothetical, and without force and effect with respect to the current appeals, even if guaranteed.

The treasurer of Foreston Coal Co., Inc., of Boston, Mass., testified (Tr. 102, 103) that his sales of *Portuguese* cement in the United States "were lower, generally, than the domestic [producers'] prices;" that "Our prices, I believe, were lower than the so-called list prices." At Tr. 114 he testified that he sells generally at lower than domestic prices. Their sales were made through the southeastern part of Massachusetts (Tr. 121).

■ The statutory procedural requirements of the ADA have been meticulously followed by the Treasury and by the Commission as is clearly demonstrated, supra. The delegation of authority to those officials is permissive and "It is axiomatic that courts are not to review the discretionary powers exercised by the President, or other executive officer, or agency, in arriving at findings in such matters." Ellis K. Orlowitz Co. v. United States, 47 Cust.Ct. 583, 586, A.R.D. 136, affirmed Id. v. Id., 50 CCPA 36, C.A.D. 816.

In Kleberg & Co. (Inc.) v. United States, 21 CCPA 110, 115, T.D. 46446, the court stated:

It is equally well established by the authorities that if the Secretary of the Treasury has proceeded in the method prescribed by the Congress, we may not judicially inquire into the correctness of his conclusions. The constitutionality of the law under which he proceeds having been once determined, then the judicial power extends only to a correction of his failure to proceed according to and within the law. United States v. Sears, Roebuck & Co., supra [20 CCPA 295, T.D. 46086]; Clarke v. United States, 17 C.C.P.A. (Customs) 420, T.D. 43866; United States v. Tower & Sons, 14 Ct.Cust. Appls. 421, T.D. 42058; United States v. Central Vermont Railway Co., 17 C.C.P.A. (Customs) 166, T.D. 43474.

This being the state of the law, we are not at liberty here to go into an investigation as to whether the facts shown on the trial below justified the issuance of the order complained of. Under the statute, the Secretary was not confined to any particular source of information or means of investigation. Furthermore, such information as he might obtain was not open to public inspection, unless he felt that the public interest so required. Norwegian Nitrogen Products Co. v. United States, 20 C.C.P.A. (Customs) 27, T.D. 45674, affirmed in 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796.

■ When "injury determination" was transferred from the Treasury to the Tariff Commission under the Customs Simplification Act of 1954 (68 Stat. 1138—89 T.D. 242, T.D. 53599), the Commission was clothed with the same discretionary power as had resided in Treasury.

The legal question presented to the court is whether or not the Commission's interpretation of the phrase that "an industry in the United States is being * * * injured" in section 201(a), ADA, as amended, properly, legally, and validly included the concurrent maintenance and the continuance of an *injury*

then existing. The court answers this in the affirmative as the existing *injury* was augmented, enlarged, and increased by the sale at less than fair value of portland cement from Portugal.

Plaintiffs' witness Joel Shine, Assistant Secretary of City Lumber Co., testified before the Commission that the firm's sales of Portuguese cement were at prices identical to delivered prices of domestic cement in Connecticut, and in the Long Island area. It is noted that the determination of injury (AA1921–16, April 4, 1961, published in 26 F.R. 3427—and .reproduced in defendant's brief as appendix A) refers to the area consisting of Rhode Island, eastern Massachusetts, and eastern Connecticut. Thus, the delivered prices of Portuguese cement were at prices to meet the *already depressed prices* which had "forced the domestic producers to lower their prices of like domestic cement below those [prices] that prevailed prior to the sales of Swedish cement at less than fair value."

Plaintiffs contend (brief, page 16), while sales of Portuguese cement were not in themselves responsible for any price reduction, that, nevertheless, the imports of Portuguese cement cannot be considered "injurious" as a matter of law, because sales thereof were made at prevailing prices. This contention is not sound and is without an effectual basis, and runs counter to congressional intent. Section 201(a), ADA, provides that the Commission shall determine " * * * whether an industry in the United States *is being or is likely to be injured* * * * by reason of the importation of such merchandise into the United States." [Emphasis supplied.]

The CCPA in the *Orlowitz* case, supra, did not attempt to "lay down a broad definition of 'industry' [as used in section 201(a)] that will be applicable to every situation." Nor does the court in the case at bar do so. On the facts in the instant case, there were many localities in the United States where local com-

petition by domestic producers of cement came into direct competition with cement imported from Portugal and elsewhere. Thus in its broadest sense "an industry in the United States is being * * * injured."

■ The intent of Congress in the court's opinion, was to protect domestic industry from sales of imported merchandise at less than fair value which either *caused or continued* an injury to competitive domestic producers of merchandise of a class or kind to that of foreign merchandise which "is being, or is likely to be, sold in the United States or elsewhere at less than its fair value." Congress did *not* limit such protection to sales that *caused* or initiated injury. Congress made no such limitation, nor did it limit its protection to only a *continued* injury. If *either* cause or continuance were present, it was sufficient to meet congressional intent.

Section 201.9, Title 19 C.F.R., provides, under "Scope of Investigation": "In ordering an investigation, the Commission will not be confined to the commodity or commodities covered by an application or a complaint but may broaden, limit, or modify the scope of the investigation." Under these extensive discretionary powers of the Commission, a consideration by them of the effect of prior determination of *injury* caused by sales of Belgium and Swedish cement *at less than fair value*, and their finding of injury herein, was an exercise of duly conferred authority, and is not *ultra vires* or null and void; does not result in exceeding its statutory authority; nor did the Commission predicate its finding of "injury" almost entirely upon importations of cement from countries *other* than Portugal. The Commission also considered sales of cement from Portugal to three American purchasers, to wit: The two plaintiffs herein and Foreston Coal Co., Inc., of Massachusetts, heretofore mentioned. It is also noted that Mr. Frank G. Parker who appeared before the Commission as counsel for City Lum-

ber Co. and as a witness for the involved exporter (Tr. 24) testified that a difference of "roughly 40 percent" existed between the price charged in the home market of Portugal and the price charged here (Tr. 46). Nor does the court discern any violation of statutory power by the Commission delegated to it by Congress under Article I, Section 8, of the Constitution of the United States to "lay and collect duties."

The court has considered all arguments presented by the respective briefs filed by counsel with the court, as well as the cited cases referred to therein. Consideration has also been given to the complete official certified record.

Plaintiffs have made a motion to file a reply brief which was received after the court forwarded its initial decision to the Clerk for final processing. I have read and considered the motion papers as well as the brief submitted, and I adhere to the decision as originally prepared. The motion papers and the brief may be filed as part of the court record.

On the record herein, I find the following facts:

1. That the imported merchandise consists of gray (grey) portland cement invoiced as "LIZ" brand complying with specifications ASTM C 150/56, Type 1, which was exported from Portugal on May 7, 1960, and June 9, 1960, respectively, in R62/3973 and R62/3974, and entered at Bridgeport, Conn., for the account of City Lumber Co. In R62/3657 the cement was exported from Portugal on August 1, 1960, and was entered at Philadelphia, Pa., for the account of Port Everglades Steel Corp.

2. The appraisers at both ports of entry appraised the cement at values under section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas.Dec. 295, T.D. 54165. Such values are not contested.

3. The appraisers at both ports of entry reported the unit foreign market values on the respective dates of purchase, and the unit purchase prices under the Antidumping Act of 1921, as amended, sections 205 and 203, respectively, which resulted in special dumping duties under section 202(a) thereof. Such values and prices were returned after the United States Tariff Commission issued its "Determination of Injury," TC Publication 37, AA1921–22 dated October 20, 1961, and the Secretary of the Treasury made public a finding of dumping on October 31, 1961 (26 F.R. 10476).

4. On July 17, 1961, the Assistant Secretary of the Treasury, in accordance with section 201(a) (19 U.S.C. § 160(a) of the Antidumping Act of 1921, as amended, advised the United States Tariff Commission that portland gray cement from Portugal "is being, or is likely to be, sold in the United States at less than fair value."

5. On July 24, 1961, the Tariff Commission issued a "Notice of Investigation" published in the Federal Register (26 F.R. 6792) under the Antidumping Act to determine "whether an industry in the United States is being or is likely to be injured" by reason of the importation of such merchandise into the United States.

6. On August 1, 1961, the Tariff Commission issued a "Notice of Hearing" published in the Federal Register (26 F.R. 7026) to the effect that a public hearing would be held in the said investigation on September 14, 1961.

7. On September 14, 1961, the Tariff Commission held such public hearing and on October 20, 1961, the Tariff Commission issued its "Determination of Injury" (TC Publication 37, AA1921–22) to the effect that a domestic industry in the United States "is being injured" by reason of the importation of portland gray cement from Portugal.

8. On October 31, 1961, pursuant to section 201(a) (c) of the Antidumping Act of 1921, as amended, the Assistant Secretary of the Treasury made public

a finding of dumping of portland gray cement imported from Portugal, published in the Federal Register (26 F.R. 10476).

9. On February 16, 1962, the appraiser at Bridgeport, Conn., made his returns of values under the Tariff Act of 1930, as amended, and the unit foreign market values and the unit purchase prices under the Antidumping Act of 1921, as amended, in R62/3973 and R62/3974, and on February 13, 1962, the appraiser at Philadelphia, Pa., made his returns of values under the Tariff Act of 1930, as amended, and the unit foreign market values and the unit purchase prices under the Antidumping Act of 1921, as amended, in R62/3657.

10. The values under the Tariff Act of 1930 and the values and prices under the Antidumping Act are conceded correct as to the amounts thereof.

11. The statutory procedural requirements of the Antidumping Act have been meticulously followed by the Treasury Department and by the Tariff Commission.

I conclude as a matter of law:

1. The Assistant Secretary of the Treasury, the Acting Secretary of the Treasury, and the United States Tariff Commission acted within delegated authority given by Congress, (a) in determining that portland cement from Portugal "is being, or is likely to be, sold in the United States at less than fair value as that term is used in the Antidumping Act" (letter dated July 17, 1961); (b) that "an industry in the United States is being injured by reason of the importation of portland gray cement from Portugal at less than fair value within the meaning of the Antidumping Act, 1921, as amended" (TC Publication 37, AA-1921–22 dated October 20, 1961); and (c) in issuing a finding of dumping (26 F.R. 10476).

■ 2. The determination that portland cement from Portugal "is being, or is likely to be, sold in the United States at less than fair value," and that an industry in the United States "is being injured" thereby, are supported by substantial evidence, and it follows that the finding of dumping was legal and proper.

3. The values returned by the appraisers under section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas.Dec. 295, T.D. 54165, and the unit foreign market values on the dates of purchase, as well as the unit purchase prices returned under the Antidumping Act of 1921, as amended, sections 205 and 203, respectively, were made in accordance with statutory requirements of the Tariff Act of 1930 and of the Antidumuping Act, and will be affirmed.

Judgment will be entered to the foregoing effect.

## APPENDIX

### SCHEDULE OF REAPPRAISEMENTS

| Reap. No. | Coll. No. | Plaintiff | Entry |
|---|---|---|---|
| | | BRIDGEPORT, CONN. | |
| R62/3973 | 432 | City Lumber Co. | 1916 |
| R62/3974 | 433 | | 18 |
| | | PHILADELPHIA, PA. | |
| R62/3657 | 7982 | Port Everglades Steel Corporation | 6104 |