**CITY LUMBER CO. et al.**

v.

**UNITED STATES.**
**Reappraisement R62/3973.**

United States Customs Court,
First Division, Appellate Term.
March 26, 1970.

Frank G. Parker, New York City, for appellants.

William D. Ruckelshaus, Asst. Atty. Gen. (Frederick L. Ikenson, New York City, trial attorney), for appellee.

Before WATSON, MALETZ, and RE, Judges.

RE, Judge:

This is an application for review of the decision and judgment of Judge David J. Wilson in City Lumber Co. et al. v. United States, 61 Cust.Ct. 448, R.D. 11557, 290 F.Supp. 385 (1968), which upheld the imposition of dumping duties on three shipments of portland gray cement exported from Portugal. Appellants claim, as they did below, that the dumping duty appraisements are illegal, and they therefore seek a reversal of the judgment entered by Judge Wilson.

The special dumping duties, under section 202(a) of the Antidumping Act of 1921, as amended (19 U.S.C. § 161(a) (1964)), were imposed after the United States Tariff Commission issued its "Determination of Injury", TC Publication 37, AA1921–22, dated October 20, 1961, and the Treasury Department, on October 31, 1961, pursuant to section 201(a) of the Antidumping Act, made public its finding of dumping. (26 F.R. 10476)

The pertinent provisions of the Antidumping Act of 1921, as amended, may be set forth as follows:

"[Section 201] (a) Whenever the Secretary of the Treasury (hereinafter called the 'Secretary') determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States or elsewhere at less than its fair value, he shall so advise the United States Tariff Commission, and the said Commission shall determine within three months thereafter whether an industry in the

United States is being or is likely to be injured, or is prevented from being established, by reason of the importation of such merchandise into the United States. The said Commission, after such investigation as it deems necessary, shall notify the Secretary of its determination, and, if that determination is in the affirmative, the Secretary shall make public a notice (hereinafter in sections 160–173 of this title called a 'finding') of his determination and the determination of the said Commission. For the purposes of this subsection, the said Commission shall be deemed to have made an affirmative determination if the Commissioners of the said Commission voting are evenly divided as to whether its determination should be in the affirmative or in the negative. The Secretary's findings shall include a description of the class or kind of merchandise to which it applies in such detail as he shall deem necessary for the guidance of customs officers.

"(b) Whenever, in the case of any imported merchandise of a class or kind as to which the Secretary has not so made public a finding, the Secretary has reason to believe or suspect, from the invoice or other papers or from information presented to him or to any person to whom authority under this section has been delegated, that the purchase price is less, or that the exporter's sales price is less or likely to be less, than the foreign market value (or, in the absence of such value, than the constructed value), he shall forthwith publish notice of that fact in the Federal Register and shall authorize, under such regulations as he may prescribe, the withholding of appraisement reports as to such merchandise entered, or withdrawn from warehouse, for consumption, not more than one hundred and twenty days before the question of dumping has been raised by or presented to him or any person to whom authority under this section has been delegated, until the further order of the Secretary, or un-til the Secretary has made public a finding as provided for in subdivision (a) in regard to such merchandise.

"(c) The Secretary, upon determining whether foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and the United States Tariff Commission, upon making its determination under subsection (a) of this section, shall each publish such determination in the Federal Register, with a statement of the reasons therefor, whether such determination is in the affirmative or in the negative." 19 U.S.C. § 160 (1964).

The record herein is entirely documentary and consists of "the complete official record in the investigation which the Tariff Commission conducted under section 201(a) of the Antidumping Act of 1921, as amended, on portland cement from Portugal No. AA1921–22."

Although several questions have been raised by the parties in their briefs, the basic question presented pertains to the validity of the dumping duties that have been assessed. In essence, the answer depends upon whether the dumping duties were based upon a valid determination of injury made by the Tariff Commission.

The decision of the Tariff Commission which contains its "Determination of Injury" is not unanimous, and contains the dissenting statement of two Commission members. The Commission's decision contains a "Majority Statement of Reasons" and the views of the two dissenting commissioners. The divergence of opinion that prevailed among the members of the Tariff Commission may be said to represent the difference of view of the parties on the fundamental question whether an industry in the United States "is being or is likely to be injured" by the importation of portland gray cement from Portugal.

On the basis of its investigation the Commission determined that "an industry in the United States is being injured by reason of the importation of portland

gray cement from Portugal at less than fair value within the meaning of the Antidumping Act, 1921, as amended."

A helpful factual background is found in the following portion of the "Majority Statement of Reasons" of the Commission:

"In this investigation, involving the sale of portland gray cement from Portugal in the United States at less than fair value, we are confronted with one of a series of investigations respecting imports of such cement under similar circumstances from a succession of foreign supplying countries. Three U. S. importers are currently involved. One of them handled transaction in 1958 for an importer of cement from Sweden that had been sold at less than fair value. In that investigation the Commission made a determination of injury * * *:

* * * * * *

"All three of these importers of Portuguese cement were responsible in 1959 for entries of portland cement from Belgium that had also been sold in the United States at less than fair value, and one of them sold such cement under circumstances that caused the Commission again * * * to make a determination of injury."

The following paragraph, also from the "Majority Statement of Reasons", sets forth the Commission's answer to the contention of the importers that, although imported cement from Portugal was sold at less than fair value, an American industry was not being injured by such sales:

"Spokesmen for the importers contended that although the imported cement from Portugal was sold at prices below fair value such sales had had no depressive impact on the prices then prevailing in the respective domestic marketing areas and therefore had occasioned no injury to domestic producers. Sellers of Portuguese cement, it was argued, merely 'met' the prices already prevailing in the respective areas; they said: 'There is no evidence in this case (unlike the Swedish case) that Portuguese cement was specifically responsible for any price break.' This reasoning appears to us to be more ingenious than tenable. To embrace this conclusion, one must overlook the fact that the prices thus 'met' in the region affected had already been depressed by earlier imports of dumped merchandise from countries other than Portugal. One must also disregard the hammering effect, and threat of additional sales thereafter below fair value of imports from new sources of supply—including those from Portugal—brought into play after avenues of dumping already utilized had been closed by enforcement of the antidumping statute. Depressed prices kept depressed by recourse to new forms of the old depressant constitutes, for domestic producers, merely a prolongation of the very injury from which it was hoped they had already gained relief."

The "Majority Statement of Reasons" contains the following pertaining to the Commission's statutory responsibility:

"When meeting its obligation under the Antidumping Act, the Commission gives consideration only to the criterion imposed upon it—viz, whether the imports identified by the Treasury Department as having been sold at less than fair value injure 'an' industry, or prevent its establishment. In order to do this, the Commission must give cognizance to the spirit of the enactment and to the evil which it was intended to prevent."

The following paragraph from the statement of the two Commission members who dissented highlights the difference of opinion and approach to the question of injury to an industry in the United States:

"The question before the Commission is whether injury or the likelihood thereof to a domestic industry exists by reason of the importation of portland gray cement *from Portugal* which has been or is likely to be sold for export to the United States at less

than fair value. This involves evaluation of facts obtained in the investigation relating to imports of such cement from this source only and their economic impact upon a domestic industry. Previous injury to domestic industry, or the possibility of future injury to domestic industry, by reason of imports of comparable cement from foreign countries other than Portugal is not determinative of the question with regard to imports *from Portugal* —indeed, such circumstances are not even probative in this case." [Emphasis in original.]

Appellants do not question the fact-finding power or discretion that has been lawfully vested in the Tariff Commission in making a determination of "injury". Rather, they assert that the majority acted upon an erroneous theory of law and in violation of its statutory authority. Specifically, they contend, as in the court below, that the Commission exceeded is statutory authority by predicating its finding of "injury" not only upon the importations of cement from Portugal, but also upon importations from countries other than Portugal. As stated in their brief, appellants contend that the Commission acted *ultra vires* "by predicating its finding of injury almost entirely upon importations of cement from countries other than Portugal and by interpreting the term 'injury' to include a prelongation [prolongation] of a previously caused condition". They also declare that "without a valid determination of injury, there could be no valid 'finding' of dumping by the Secretary and, in turn, no authority for the assessment of dumping duties."

Appellants correctly point out that the fundamental question of law facing the court is "whether the finding of injury by the majority of the Tariff Commission was an exercise of duly conferred authority or *ultra vires* and null and void."

Appellee maintains that the Tariff Commission and the Secretary of the Treasury, and his delegates, acted within the authority delegated by the Congress in finding that an industry in the United States was being injured by the sale of portland gray cement imported from Portugal.

The court below upheld the interpretation of the Tariff Commission that the phrase that "an industry in the United States is being * * * injured" in section 201(a) of the Antidumping Act properly and validly included "the concurrent maintenance and the continuance of an *injury* then existing." City Lumber Co. et al. v. United States, 61 Cust.Ct. at 457, 290 F.Supp. at 391–392. [Emphasis in original.] The court answered the question of injury in the affirmative "as the existing *injury* was augmented, enlarged, and increased by the sale at less than fair value of portland cement from Portugal." - *Ibid.* [Emphasis in original.] In sustaining the determination of injury of the majority of the Tariff Commission, the court set forth its understanding of the legislative intent behind the Antidumping Act. In his decision, Judge Wilson stated:

"The intent of Congress in the court's opinion, was to protect domestic industry from sales of imported merchandise at less than fair value which either *caused* or *continued* an injury to competitive domestic producers of merchandise of a class or kind to that of foreign merchandise which 'is being, or is likely to be, sold in the United States or elsewhere at less than its fair value.'" *Id.* at 457–458, 290 F.Supp. at 392. [Emphasis in original.]

Judge Wilson consequently concluded that:

"Congress did *not* limit such protection to sales that *caused* or initiated injury. Congress made no such limitation, nor did it limit its protection to only a *continued* injury. If *either* cause or continuance were present, it was sufficient to meet congressional intent." *Ibid.* [Emphasis in original.]

As found by the court below, there is no question as to the values under the

Tariff Act of 1930 and the values and prices under the Antidumping Act since they are concededly correct as to amounts. After an examination of the pertinent statutory provisions, the applicable regulations and the procedural steps taken, the court also found that the "statutory procedural requirements of the Antidumping Act have been meticulously followed by the Treasury Department and by the Tariff Commission." *Id.* at 460, 290 F.Supp. at 394.

In view of the findings of fact made below, and the court's understanding of the governing legislative intent, the court below concluded as a matter of law that:

"The Assistant Secretary of the Treasury, the Acting Secretary of the Treasury, and the United States Tariff Commission acted within delegated authority given by Congress, (a) in determining that portland cement from Portugal 'is being, or is likely to be, sold in the United States at less than fair value as that term is used in the Antidumping Act' (letter dated July 17, 1961); (b) that 'an industry in the United States is being injured by reason of the importation of portland gray cement from Portugal at less than fair value within the meaning of the Antidumping Act, 1921, as amended' (TC Publication 37, AA1921–22 dated October 20, 1961); and (c) in issuing a finding of dumping (26 F.R. 10476)." *Ibid.*

■ There is inherent in judicial review the unspoken premise that the wisdom of the congressional enactment is not before the court. See opinion of Mr. Justice Stone, dissenting in United States v. Butler, 297 U.S. 1, 78, 56 S.Ct. 312, 80 L.Ed. 477 (1936).

■■ Also, there can be no doubt of the express constitutional power of Congress, under Article I, Section 8 of the Constitution, "to lay and collect * * * duties" and "to regulate commerce with foreign nations". There likewise can be no question of the ability of Congress properly to delegate such power. J. W. Hampton, Jr., & Co. v. United States,

276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928), affirming 14 Ct.Cust. Appls. 350 (1927); Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892); Buttfield v. Stranahan, 192 U.S. 470, 24 S.Ct. 349, 48 L.Ed. 525 (1904); C. J. Tower & Sons v. United States, 71 F.2d 438, 21 CCPA 417, T.D. 46943 (1934).

■ Clearly Congress acted within its constitutional powers in enacting the Antidumping Act of 1921, and its constitutionality has been expressly upheld in the case of Kleberg & Co. (Inc.) v. United States, 71 F.2d 332, 21 CCPA 110, T.D. 46446 (1933). Under that act Congress entrusted the making of the determination of dumping and injury to designated executive officers. Hence, in reviewing these determinations it is not the function of the court to substitute its discretion for that of the legislative agents. It is the proper function of the court to construe the enabling act, and to determine the meaning of any doubtful word, phrase or provision. Even in the performance of this function the court may consider and, if warranted by reasonableness, persuasiveness, experience and expertise, give weight to the judgment of those officials whose duty it is to administer the questioned statute. National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); National Labor Relations Board v. Denver Building and Construction Trades Council et al., 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); United States v. American Trucking Associations, Inc., 310 U.S. 534, 60 S.Ct. 1959, 84 L.Ed. 1345 (1940). As stated by the Supreme Court in Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), "[w]hen faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration." In the Udall v. Tallman case the Supreme Court quoted from Unemployment Compensation Commission, etc. v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136

(1946), wherein the court observed that "[t]o sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." See also opinion of Mr. Justice Cardozo in Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933), which discusses the history and unique role of the Tariff Commission.

On the question of the authority of the Secretary of the Treasury under that act, as pointed out in the *Kleberg* case, "[u]nder the statute, the Secretary was not confined to any particular source of information or means of investigation." 21 CCPA at 115, 71 F.2d at 335. Although the "injury determination" was subsequently transferred from the Treasury Department to the Tariff Commission by the Customs Simplification Act of 1954 (68 Stat. 1138, 89 Treas.Dec. 242, T.D. 53599), there is no doubt that the Commission is vested with the same discretionary powers previously possessed by the Secretary of the Treasury.

Since the statute sets forth no explicit criteria which define what constitutes an "injury", reference has been made to its legislative history. In the words of Judge Donlon in Ellis K. Orlowitz Co. v. United States, 47 Cust.Ct. 583, 587, A.R.D. 136, (1961), aff'd 50 CCPA 36, (1963), the Antidumping Act makes it clear that:

> "* * * the concern of Congress was to protect the producers of the United States against actual or threatened demoralization of American markets which could result from the exportation from foreign countries of articles into the United States at prices less than the fair market value of those articles when sold for home consumption in the foreign country of exportation in usual and ordinary course. * * *"

In an article which contrasts the United States Antidumping Act of 1921 with the International Anti-Dumping Code of 1967, Senator Russell B. Long of Louisiana points out that the "injury" requirement of the Antidumping Act was incorporated into the statute as an "administrative convenience", and that it "should be given a broad (liberal) construction * * *." Long, United States Law and the International Anti-Dumping Code, 3 Int'l. Lawyer 464, 475 (1969).

Since the Anti-Dumping Code of 1967 is not pertinent to the case at bar, Senator Long's observations about that Executive Agreement are not germane here. The following statements, however, concerning the law of the United States are relevant:

> "Under the Antidumping Act of 1921, the Tariff Commission was given the responsibility of determining whether or not an industry is being, or is likely to be, injured by dumped imports. In exercising this statutory responsibility, the Commission has used the widest discretion over the years in applying the Act to the facts of each case." *Id.* at 488.

That the exercise of this delegated discretionary power has been expressly upheld by the courts may be noted from cases such as Kleberg & Co. (Inc.) v. United States, 71 F.2d 332, 21 CCPA 110, T.D. 46446 (1933), and the *Ellis K. Orlowitz Co.* case, *supra.* As stated in the *Ellis K. Orlowitz Co.* case:

> "Congress can, and often does, delegate to the President, or other executive officer or agency, authority to make findings in prescribed situations, and, on the basis of such findings, to promulgate orders. This is a permissible delegation of legislative authority to the executive branch of our Government. It is axiomatic that courts are not to review the discretion exercised by the President, or other executive officer or agency, in arriving at findings in such matters. Citation of authority is not necessary to support this well-recognized rule, requir-

ing judicial noninterference in legislative authority constitutionally conferred by Congress on the executive." 47 Cust.Ct. at 585–586.

■■ It is clear, therefore, that the courts will not substitute a judicial discretion for that of the administrative officer to whom discretionary power has been properly delegated. This, however, in no way affects the judicial responsibility to inquire whether the administrative officer has acted within the scope of his delegated authority. That the executive official has not acted *ultra vires* is, of course, a judical question properly raised on judicial review of the administrative determination.

In the case at bar, after a thorough examination of the record, the court agrees with the findings made by the court below that the "statutory procedural requirements of the Antidumping Act have been meticulously followed by the Treasury Department and by the Tariff Commission." 61 Cust.Ct. at 460.

Appellants nevertheless contend that the administrative officials, and the court below, erred in construing the pertinent statutory authority contained in the Antidumping Act. Appellants maintain that the statutory protection intended for an industry of the United States is limited only to sales at less than fair value that *initiate* or *cause* an injury to the domestic industry. According to appellants' interpretation of the statutory mandate and authorization, such protection would not include sales at less than fair value that *continued* a previously caused injury.

■ In determining the statutory authority of the Antidumping Act, the court's primary consideration must be the effectuation of the declared policy and purpose of the act. After such consideration the court cannot agree with appellants' limited or restrictive interpretation of the Antidumping Act. The act was drawn in broad terms and its purpose was clearly to protect a domestic industry from "dumping". Dumping, in a foreign-trade sense, implies that there are, or are likely to be, "sales at less than fair value", of foreign merchandise in the United States, that cause, or are likely to cause, injury to a domestic industry. The broad sweep of the statute may also be noted from the fact that it embraces not only an "injury" to a domestic industry, but also the *likelihood* of injury. See Ellis K. Orlowitz Co. v. United States, 50 CCPA at 41.

The language of the Antidumping Act, "is being or is likely to be injured", manifests a congressional intent to protect domestic industry from sales at less than fair value which either caused or continued an injury to a competing domestic industry. Had Congress intended a protection limited to sales which only *caused* injury it would have used appropriate limiting language as it has done in other enactments. For example, section 7 of the Trade Agreements Extension Act of 1951, as amended (19 U.S.C. § 1364, repealed 1962 [Public Law 87–794, 76 Stat. 882]), employs the language "to cause or threaten serious injury to the domestic industry". The language of the Trade Expansion Act of 1962 (Public Law 87–794, 76 Stat. 872) is "to cause or threaten serious injury to an industry". No such restriction or limitation is found in the Antidumping Act of 1921, and in subsequent amendments to the act the pertinent language was left intact.

American concern with the problem of injurious dumping dates back to early American history. See generally Viner, Dumping: A Problem in International Trade (1923) and Smith, Customs Valuation in the United States: A Study in Tariff Administration 79–80 (1948). See also Metzger, Law of International Trade: Documents and Readings 739–899 (1966), in particular, Excerpts from Treasury Department Memorandum, 1961, at 751–753. To hold that the Antidumping Act of 1921 provided a limited and restrictive remedy would be

violative of the language of the act itself and its legislative history. Since the crux of the matter revolves around the determination of injury it is well to remember that the 1921 Antidumping Act, as passed by the House of Representatives, would have assessed special dumping duties against any kind of dumping in competition with a domestic industry without requiring a determination of injury. The injury requirement was incorporated into the bill by the Senate Finance Committee, but, as pointed out in that Committee's report, the purpose was to facilitate administration of the law, and not to restrict its operation. See Senate Report 16, 67th Cong., 1st Sess. p. 10. The House conferees agreed to the amendment, and the act was thus passed with the injury determination requirement. Act of May 27, 1921, 42 Stat. 11, as amended, 19 U.S.C. §§ 160–173 (1964).

This particular aspect of the legislative history of the Antidumping Act was discussed by this court in the *Ellis K. Orlowitz & Co.* case where it was stated that:

"There was no suggestion, as we read the Senate proposal and proceedings, of intention either to limit or enlarge the concept of 'injury' intended in the House bill, where the mandate was to each individual appraising officer in his own district. Mere intention to improve administration is not persuasive of an intention to change the scope of the law. The clearly expressed intention was to facilitate administration, and no intention was expressed other than to do that. This is persuasive of a legislative intention that the basic objectives were not to be changed." 47 Cust.Ct. at 590.

That the Tariff Commission has assumed that it possesses the widest latitude in conducting its investigation may also be noted from the applicable rules and regulations that have been enacted to achieve the statutory mandate. See 19 CFR Part 201—United States Tariff Commission, Rules of General Application. Section 201.9 of such rules, for example, provides that "[i]n ordering an investigation, the Commission will not be confined to the commodity or commodities covered by an application or a complaint but may broaden, limit, or modify, the scope of the investigation." The validity of the applicable regulations, including the quoted rule, cannot be seriously questioned.

■ The Tariff Commission fully complied with its procedural rules in investigating the economic impact on the market under investigation of successive importations of portland gray cement at less than fair value. Indeed, an investigation of imports from only one country, in disregard of the effect on the market area in question, of sales at less than fair value from other countries, would result in a study and conclusions that would be myopic and unrealistic. An investigation so limited and restricted would not help achieve the statutory remedy envisaged by the enabling legislation. It would seem clear that the mischief that the act aimed to remedy required a broad solution. Surely Congress did not seek to fashion a remedy to the problem of dumping "by solutions only partially effective." National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 125, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).

Appellee's contention that the phrase "is being, or is likely to be injured" includes a maintenance, prolongation or continuation of an injury is both reasonable and realistic. The statutory phraseology is not of limited scope. Significantly, "being" is defined in Funk & Wagnall New Standard Dictionary of the English Language, 1951, as "[e]xisting; continuing to be", and contains the explanatory comment that it expresses "progressive action". The meaning urged by the appellee has been applied by the Tariff Commission, and has been upheld by the court below. Such a meaning is entirely reasonable and com-

mends itself to the court for it is calculated to effectuate the legislative purpose.

The construction urged by appellants, on the other hand, would compel the domestic industry, in the words of the Ta iff Commission "to suffer continued injury". As concluded by the Commission, a "denouement of such character was never the purpose of the Antidumping Act, and * * * meets neither the letter nor the spirit of the act."

 The court finds that Judge Wilson, in his decision and judgment, the subject of this application for review, properly considered all of the evidence in the case, and that his findings of fact are fully supported by the substantial weight of the evidence. See Golding Bros. Co., Inc. v. United States, 21 CCPA 395, T.D. 46926 (1934); United States v. Baldwin Universal Co., 18 CCPA 394, T.D. 44641 (1931), and cases cited therein.

After due consideration of the questions presented herein, both of law and fact, the court hereby expressly adopts and incorporates by reference each and every finding of fact and conclusion of law made by the court below.

In view of the foregoing, the court affirms the conclusion of the court below that upheld the validity of the determination that portland cement from Portugal "is being, or is likely to be, sold in the United States at less than fair value", and that an industry in the United States "is being injured" by such sales.

Since the disputed actions of the executive officials were a reasonable exercise of lawfully delegated authority, and since these actions were properly upheld by the court below, the court sustains the dumping duties and appraisements fixed on the three shipments of portland gray cement exported from Portugal.

The decision of the trial court should be and is hereby affirmed. Judgment will be entered accordingly.