**CHAPARRAL STEEL COMPANY,**
Plaintiff–Appellee,

v.

**The UNITED STATES,**
Defendant–Appellant,

and

**Norsk Jernverk A.S.,**
Defendant–Appellant.

Nos. 89–1338, 88–1339.

United States Court of Appeals,
Federal Circuit.

April 17, 1990.

Suggestion for Rehearing In Banc Declined
May 29, 1990.

Stephen McLaughlin, U.S. Intern. Trade Com'n, Washington, D.C., argued for defendant-appellant, The U.S.

Arnold Podgorsky, Gerst, Heffner, Carpenter & Podgorsky, Washington, D.C., argued for defendant-appellant, Norsk Jernverk A.S. With him on the brief were Mary Todd Carpenter and Carrie L. Bumgarner. Also on the brief was Frederick P. Waite, Davis, Graham & Stubbs, Washington, D.C.

Charles O. Verrill, Jr., Wiley, Rein & Fielding, Washington, D.C., argued for plaintiff-appellee. With him on the brief were John A. Hodges and Eileen P. Bradner; Alan H. Price, Wiley, Rein & Fielding, Washington, D.C., of counsel.

Before NIES, NEWMAN and MICHEL, Circuit Judges.

MICHEL, Circuit Judge.

This is an interlocutory appeal from a September 28, 1988 order of the United States Court of International Trade, 698 F.Supp. 254 (Ct.Int'l Trade 1988), remanding a negative injury determination made in 1985 and directing the United States International Trade Commission (ITC) to cumulate certain imports from Poland, Spain, and South Africa with imports from Norway in the ITC's investigation, *Carbon Steel Structural Shapes from Norway*, USITC Pub. 1785, Inv. No. 731–TA–234 (Nov. 1985) (final). The trial court certified its order for immediate appeal, *Chaparral Steel Co. v. United States*, Court No. 85–12–01767 (Ct.Int'l Trade Dec. 22, 1988) (order), and this court accepted the appeal. *Chaparral Steel*, Misc. Nos. 231 & 232 (Fed.Cir. Feb. 2, 1989) (order). We conclude that the Court of International Trade erred in rejecting the ITC's interpretation of the statutory requirements for cumulation, and accordingly we reverse.

## BACKGROUND

Chaparral Steel Company (Chaparral), a United States producer, filed a petition for imposition of antidumping duties with the ITC and the International Trade Administration (ITA) on December 19, 1984, alleging that structural steel shapes from Norway and Poland were being sold here at less than fair value (LTFV). In February of 1985, the ITC made a preliminary determination there was a reasonable indication of material injury or threat of material injury to the domestic industry because of these combined imports. In June of 1985, the ITA made preliminary dumping determinations, fixing a 59.96 percent margin for Polish imports, *see Carbon Steel Structural Shapes from Poland*, 50 Fed.Reg. 23,329 (Dep't Comm.1985), and an 8.62 percent margin for Norwegian imports, *see Carbon Steel Structural Shapes from Norway*, 50 Fed.Reg. 23,326 (Dep't Comm. 1985).

*Poland, Spain, and South Africa*

Later in 1985, the United States and Poland entered into a Voluntary Restraint Agreement (VRA)[1] wherein Poland agreed to reduce exports of steel products to the U.S. on the condition that U.S. producers

---

1. A VRA is an agreement between the United States and a foreign government wherein the foreign government agrees to limit exports to the United States. The agreements relevant to this appeal were conditioned on the withdrawal of petitions filed by private parties, termination of ongoing antidumping and/or countervailing duty proceedings, and revocation of outstanding duty orders related to the product. *See Presi-dent's Memorandum to United States Trade Representative on Steel Import Relief Determination*, 3 C.F.R. 251 (1985) (compilation of 1984 documents). Congress authorized the President to enforce VRAs in the Steel Import Stabilization Act, Title VIII of the Trade and Tariff Act of 1984. 19 U.S.C. § 2253 note (1988); *see Oregon Steel Mills, Inc. v. United States*, 862 F.2d 1541, 1546 (Fed.Cir.1988).

such as Chaparral withdraw their petitions for the investigation. Chaparral withdrew its petition and both the ITC and ITA terminated their respective investigations of the Polish imports. *See Carbon Steel Structural Shapes from Poland,* 50 Fed. Reg. 31,931 (USITC 1985) (termination); 50 Fed.Reg. 32,101 (Dep't Comm.1985) (same). Consequently, no final determination of LTFV sales from Poland was ever made.

On January 3, 1983, various Spanish steel imports determined to have been subsidized were made subject to a countervailing duty (CVD) order. *See Stainless Steel Wire Rod from Spain,* 48 Fed.Reg. 52 (Dep't Comm.1983) (order). In September of 1982, subsidized South African steel imports were also made subject to countervailing duties. *See Certain Steel Products from South Africa,* 47 Fed.Reg. 39,379 (Dep't Comm.1982) (order).

On December 13, 1984, following a petition by United States Steel Corporation, the ITA made a final determination that Spanish structural steel shapes were being sold at LTFV. *See Certain Carbon Steel Products from Spain,* 49 Fed.Reg. 48,582 (Dep't Comm.1984) (final). During the pendency of the ITC's final injury investigation, in January of 1985, Spain and the United States entered into a VRA and the ITC investigation of injury was terminated. Thus no antidumping duty order was entered with respect to Spanish imports. *See Certain Carbon Steel Products from Australia, Finland, and Spain,* 50 Fed.Reg. 4276 (USITC 1985) (termination). Also, due to the VRA, the outstanding CVD order was revoked retroactively to October 1, 1984. *See Certain Steel Products from Spain,* 50 Fed.Reg. 33,809 (Dep't Comm. 1985) (revocation). In 1985, during the annual review period, ITA also revoked the CVD order previously imposed against subsidized South African steel imports because of a lack of interest by the domestic industry in a continued order. *See Certain Steel Products from South Africa,* 50 Fed. Reg. 35,851 (Dep't Comm.1985) (revoca-

tion). The revocation was retroactive to October 1, 1984. *Id.*

*Norway*

On October 23, 1985, the ITA concluded its investigation, which had preliminarily found an 8.6 percent margin, and made a final determination that the imports from Norway were being sold at LTFV by a margin of 13.7 percent. *Carbon Steel Structural Shapes from Norway,* 50 Fed. Reg. 42,975 (Dep't Comm.1985). ITC, however, made a final negative injury determination concluding that there was no material injury to the domestic steel industry by reason of any less than fair value imports from Norway. ITC found, *inter alia,* that the volume of imports from Norway was at a relatively low level and that there was no causal link between the Norwegian sales and harm to the domestic industry. *See Carbon Steel Structural Shapes from Norway,* USITC Pub. 1785, Inv. No. 731–TA–234, at 9–12. When it made that determination, ITC did not cumulate[2] with the Norwegian imports those from Poland and Spain subject to the antidumping investigations terminated by the VRAs, because ITC concluded that these imports were not subject to a pending investigation and thus did not fall under the cumulation provision of 19 U.S.C. § 1677(7)(C)(iv) (1988). Likewise, imports from Spain and South Africa, upon which CVD orders were issued, were not cumulated because those imports did not enter the U.S. market "reasonably coincident" in time with the imports from Norway.

In making its final negative injury determination for Norway, the ITC gave this specific justification for declining to cumulate:

> To warrant cumulative analysis, the unfairly traded imports must satisfy three requirements. They must compete with both other imports and the domestic like product, be subject to investigation, and be marketed within a reasonable coincidental period. In this instance, the

---

**2.** Cumulation involves aggregating data from two or more other countries on volume and effect when the ITC makes a determination whether or not unfair imports from the country

under investigation cause material injury or threat of material injury. Whether the unfairness arises from dumping or subsidies does not matter. *See infra,* note 3.

"candidates" for cumulation proposed by petitioner fail to satisfy two of the three requirements.

Both Poland and Spain have entered voluntary restraint agreements (VRAs) with the United States. The antidumping investigations regarding imports from these countries of the products at issue in the instant investigations were terminated as a result of the withdrawal of the petitions. The terminations occurred *prior to any final determinations as to whether the imports were unfairly traded.* The statute does not require cumulation in such circumstances. Because these imports have not been and will not be determined to be unfairly traded and because they are not subject to a *pending investigation,* we conclude that it is not appropriate to include them in any cumulative analysis.

Absent consideration of imports from countries subject to VRAs, the only remaining imports of the subject products available for consideration are those structural shapes from South Africa and Spain upon which countervailing duty orders were issued.... Further, we note that the CVD orders in question are remote in time, and the unfairly traded imports which were subject to the investigations resulting in those orders did not enter the U.S. market reasonably coincident in time with the imports currently under investigation. Consequently, there are no imports of carbon steel structural shapes which satisfy the criteria for cumulation with imports from Norway.

*Carbon Steel Structural Shapes from Norway,* USITC Pub. 1785, at 7–9 (footnotes omitted) (emphasis added).

Chaparral appealed the ITC's determination because of its decision not to cumulate imports from Poland, Spain, and South Africa. The Court of International Trade held that ITC was required to cumulate the volume and price effects of the imports from Poland, Spain, and South Africa with like imports from Norway for the period of the Norway investigation. *Chaparral Steel Co. v. United States,* 698 F.Supp. 254, 265–66 (Ct. Int'l Trade 1988). The

court held that the phrase "subject to investigation" must be interpreted by reference "to the time frame involved in the [Norwegian] injury investigation." *Id.* at 265. The court reasoned that even a preliminary ITA determination of LTFV sales can properly trigger cumulation because "the absence of a final determination is not dispositive but merely affects the weight and credibility of the evidence and not its overall relevance." *Id.*

With respect to the subsidized imports from Spain and South Africa, the court rejected the ITC's view that only the imports entered prior to the effective date of the CVD orders can be considered unfairly traded and those imports were not reasonably coincident in time with the Norwegian imports. The court reasoned that, despite the CVD orders, those imports might have residual effects.

The ITC and the Norwegian manufacturer, Norsk Jernverk A.S., sought and obtained certification for an interlocutory appeal from the Court of International Trade's order remanding the case to the ITC and directing the ITC to cumulate the imports from Poland, Spain, and South Africa with the imports of Norwegian structural steel, in accordance with the trial court's opinion. We accepted the appeal under 28 U.S.C. § 1292(d)(1) (1982).

## ISSUE

Whether the ITC's interpretation of 19 U.S.C. § 1677(7)(C)(iv) (1988) as not requiring cumulating the effect of imports from Spain, Poland, and South Africa, was reasonable.

## OPINION

### I. *Standard of Review*

This appeal involves statutory interpretation, a question of law on which we must exercise our own independent judgment; we need not defer to the trial court. *See Madison Galleries, Ltd. v. United States,* 870 F.2d 627, 629 (Fed.Cir.1989). Our court must first determine if the statute is clear on its face. *See United States v.*

*John C. Grimberg Co.*, 702 F.2d 1362, 1365 (Fed.Cir.1983) ("Analysis must begin with the language of the statute."). If the statutory language is clear, then "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

If, however, the statute is not clear on its face and the agency has made an interpretation of the statute, then we cannot:

> simply impose [our] own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 843, 104 S.Ct. at 2782 (footnotes omitted); *see Corning Glass Works v. United States Int'l Trade Comm'n*, 799 F.2d 1559, 1565, 230 USPQ 822, 826 (Fed. Cir.1986) (Commission's definitions must be "*reasonable* in light of the language, policies and legislative history of the statute.").

II.  *The Statute*

The relevant provision mandates cumulation of the volume and effect of imports "subject to investigation if such imports compete with each other and with like products of the domestic industry in the United States market." 19 U.S.C. § 1677(7)(C)(iv) (1988). To include imports in the cumulation equation, the statute requires they be "subject to investigation," "compete" with like products, and implies that they be marketed "reasonably coincident" in time, but it fails to define those terms, as to time or otherwise. Accordingly the provision cannot be said to have a plain meaning.

III.  *Legislative History*

What Congress intended by these words and phrases, particularly "subject to investigation," is not immediately clear from the express legislative history of this provision, first added to the law in the Trade and Tariff Act of 1984, Pub.L. No. 98–573, § 612, 98 Stat. 2948, 3033. We must, therefore, consider the purpose for enactment of the cumulation provision to discern its intended meaning.

Cumulation was mandated in order "to eliminate inconsistencies in Commission practice and to ensure that the *injury test* adequately address[ed] *simultaneous unfair imports* from different countries.... The Committee believe[d] that the practice of cumulation is based on the sound principle of preventing material injury which comes about by virtue of several *simultaneous unfair acts* or practices." House Comm. on Ways and Means, Trade Remedies Reform Act of 1984, H.R.Rep. No. 725, 98th Cong., 2d Sess. 37, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4910, 5127, 5164 (emphasis added) [hereinafter House Rep. No. 725].

The Conference Report stated, "The provision requires cumulation of imports from various countries that each account individually for a small percentage of total market penetration but when combined may cause material injury. The conferees do intend, however, that the marketing of imports that are [cumulated] be reasonably coincident." H.R.Conf.Rep. No. 1156, 98th Cong., 2d Sess. 173, *reprinted in* 1984 U.S. Code Cong. & Admin.News 5220, 5290.

IV.  *Court of International Trade's Interpretation*

The trial court concluded that the words "subject to investigation" "*must be interpreted* by reference to the [entire] timeframe of the *investigation* of injury." *Chaparral Steel*, 698 F.Supp. at 256 (emphasis added). Further, the trial court concluded that a preliminary determination of dumping would suffice for cumulation purposes and a final determination of unfair trading was not required. *Id.* at 261. We cannot agree to this interpretation of how the provision "must be interpreted" because neither the statutory language nor the legislative history is clear. Moreover, while the court focused on the "investigation of injury," House Report 725 referred

to the "injury test." *See* House Rep. No. 725, *supra* at 37, *reprinted in* 1984 U.S. Code Cong. & Admin.News at 5164. The former spans many months, but the latter is applied the day the ITC makes its final determination.

In rejecting the ITC's interpretation of the cumulation provision as requiring reasonably coincident importation, the court stated: "A finding of reasonable coincidence in the marketing of imports is not precluded by the issuance of a [CVD] order. Further, the remoteness in time of an order is not determinative under the cumulation provision." *Chaparral Steel,* 698 F.Supp. at 264.

The trial court rested its rejection of the ITC's interpretation on three bases:

(1) a case decided *before* the 1984 cumulation provision was enacted, *Republic Steel Corp. v. United States,* 591 F.Supp. 640 (Ct.Int'l Trade 1984) (*overruled in part [on other grounds], American Lamb Co. v. United States,* 785 F.2d 994, 1004 (Fed. Cir.1986));

(2) a statement in *Bingham & Taylor Div., Virginia Indus. v. United States,* 627 F.Supp. 793, 797 (Ct. Int'l Trade 1986), *aff'd,* 815 F.2d 1482, 1486 (Fed.Cir.1987) (Congress "elected to mandate cumulation in broad terms"); and

(3) the court's assessment of the general legislative purpose of the statute.

We do not find these reasons adequate to overturn the ITC's interpretation.

In *Republic Steel,* the Court of International Trade held that the test for cumulation, then merely an ITC practice, not a statutory requirement, is "whether subsidized *or allegedly subsidized* imported products are competing with the product of a domestic industry during a period when the effect of these importations is being felt by the domestic industry." *Republic Steel,* 591 F.Supp. at 645 (emphasis added).[3] But the cumulation provision was added to the statutory scheme *after* the Court of International Trade's *Republic Steel* decision and without legislative history that endorsed that holding. Moreover, the new provision specified a very different test. While the *Republic Steel* test requires cumulation of "allegedly" unfair imports, *id.,* the enacted provision mandates cumulation only of imports "of like products subject to investigation." *See* 19 U.S.C. § 1677(7)(C)(iv) (1988).

■ The difference is significant. A mere allegation of subsidization or dumping in a U.S. producer's petition is not enough to make an import "subject to investigation." The statute requires ITA to make a determination that the petition alleges not only all elements required for imposition of a duty but also that it contains information reasonably available to petitioner to support the allegations. *See* 19 U.S.C. §§ 1671a(c)(2) & (3); 19 U.S.C. §§ 1673a(c)(2) & (3) (1988). Only if the determination of the sufficiency of the petition is affirmative "shall [ITA] commence an investigation." 19 U.S.C. § 1671a(c)(2); 19 U.S.C. § 1673a(c)(2) (1988). If ITA's determination is negative, the petition is dismissed. We thus can find no congressional intent to codify the "allegedly unfair imports" test of *Republic Steel.*[4]

---

**3.** Cumulation provisions operate identically for both unfair imports that are subsidized and those that are dumped. *Compare* 19 U.S.C. § 1671d (1988) *with* 19 U.S.C. § 1673d (1988). Where different types of unfair imports are cumulated in an ITC investigation, the term "cross-cumulation" is used.

**4.** Quoting *City Lumber Co. v. United States,* 311 F.Supp. 340, 343 (Cust.Ct.1970), *aff'd,* 457 F.2d 991 (CCPA 1972), the trial court also asserted that the full time period of an investigation should be used in cumulating to redress the "'collective hammering effect' due to the imports of new sources of supply 'after avenues of dumping already utilized [have] been closed by enforcement of the antidumping statute.'" *Chaparral Steel,* 698 F.Supp. at 260. But the section of the Customs Court's *City Lumber* opinion discussing the "collective hammering effect" was criticized on appeal by our predecessor court, the CCPA. The CCPA stated that the ITC's cumulating of imports not subject to a final LTFV determination in determining injury to the domestic industry was "more or less in the nature of an aside" by the ITC. The CCPA specifically noted that even absent consideration of those imports, "there [was] much other evidence to support [the ITC's injury determination] even in the public record." *City Lumber,* 457 F.2d at 997.

The trial court opined that "it is clear that Congress did not intend the ITC to focus on the procedural status of a 'simultaneously unfair act or practice' on the date that a vote on material injury is rendered." *Chaparral Steel,* 698 F.Supp. at 260. However, we do not see that ITC looked only at the procedural status but rather concluded that some imports could not possibly be found to be unfairly traded because of the VRAs and those that had been found unfair (South African and Spanish imports entered prior to the CVD orders) were not marketed contemporaneously in time, "reasonably coincident," with Norwegian sales under investigation.

■ The second basis of the Court of International Trade's decision is the statement in its own prior opinion in *Bingham & Taylor,* that Congress "elected to mandate cumulation in broad terms." *Chaparral Steel,* 698 F.Supp. at 260 (citing *Bingham & Taylor,* 627 F.Supp. at 797). However, the quoted language does not support an inference of congressional intent to mandate cumulation of sales that could not be found unfair or were not contemporaneously marketed. The language in *Bingham & Taylor* that cumulation was mandated "in broad terms" is correct in that the 1984 Act did not exclude any *category* of investigation from the cumulation requirement, *i.e.,* subsidized or dumped imports. That hardly shows that Congress intended cumulation of all imports investigated *anytime* during the duration of an ITC injury investigation, even those that were not and never could be found unfairly traded. *See* House Rep. No. 725, *supra,* at 37, *reprinted in* 1984 U.S.Code Cong. & Admin.News at 5164 (the purpose of mandating cumulation is "to ensure that the *injury test* adequately addresses *simultaneous* unfair imports.... [I]mports of like products from countries not *subject to investigation* would not be included in the cumulation.") (emphasis added).

■ That "subject to investigation" is better understood as relating only to present injury to the domestic industry can also be seen from the remedial, rather than punitive, compensatory, or retaliatory nature of antidumping duties.[5] The ITC construed the statutory scheme to require cumulation only of *currently* unfair imports, not those corrected by VRAs or by the assessment of duties. This is in accord with the remedial purpose of duties which are intended merely to prevent future harm to the domestic industry by reason of unfair imports that are *presently* causing material injury. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 87, *reprinted in* 1979 U.S. Code Cong. & Admin.News 381, 473 (In accord with the GATT, the domestic industry must be materially injured "by reason of the less-than-fair-value or subsidized imports."); *id.* at 39, *reprinted in* 1979 U.S. Code Cong. & Admin.News at 425 ("[N]either countervailing nor antidumping duties may be imposed at all *unless* the dumping or subsidization *causes* or threatens to cause *material injury* to a domestic industry....") (emphasis added).

Even before the U.S. antidumping law was modified in 1979 to conform with GATT requirements, it was clear that duties were intended to be solely remedial. *See Imbert Imports, Inc. v. United States,* 331 F.Supp. 1400, 1406 (Cust. Ct.1971), *aff'd* 475 F.2d 1189 (CCPA 1973) (interpreting Antidumping Act of 1921 as "mandat[ing] the taking of prescribed *remedial* action in the event of dumping and *resultant injury* to an industry....") (emphasis added); S.Rep. No. 1221, 92d Cong., 2d Sess. 8 (1972) ("[C]ountervailing duties are *not,* nor were they ever intended to be, *penal* in nature; they are remedial in nature inasmuch as they operate to offset the effect of subsidies afforded foreign mer-

---

5. A contrary reading would also appear inconsistent with the General Agreement on Tariffs and Trade, a portion of which provides that dumped imports must be causing injury: "injuries caused by other factors must not be attributed to the dumped imports." Other factors include "imports not sold at dumping prices."

Agreement on the Implementation of Article VI of the General Agreement on Tariffs and Trade, Apr. 12, 1979, 31 U.S.T. 4919, 4927, T.I.A.S. No. 9650; *see* Interpretation and Application of Articles VI, XVI and XXIII of General Agreement on Tariffs and Trade, Apr. 12, 1979, 31 U.S.T. 513, 528, T.I.A.S. No. 9619 (Subsidies Code).

chandise.") (emphasis added); *cf.* S.Rep. No. 1298, 93d Cong., 2d Sess. 123, *reprinted in* 1974 U.S.Code Cong. & Admin.News 7186, 7267 ("*[N]o compensation or retaliation* is in order" under the antidumping or countervailing duty scheme.) (emphasis added). *See National Ass'n of Mirror Mfrs. v. United States,* 696 F.Supp. 642, 645 (Ct.Int'l Trade 1988) (statute is remedial); *Badger–Powhatan v. United States,* 608 F.Supp. 653, 656 (Ct.Int'l Trade 1985) (same).

The injury requirement mandates a determination of whether an industry suffers *present* material injury. *American Spring Wire Corp. v. United States,* 590 F.Supp. 1273, 1276 (Ct.Int'l Trade 1984) (The Commission makes "an affirmative finding only when it finds both (1) *present* material injury (or threat to or retardation of the establishment of an industry) and (2) that the material injury is 'by reason of' the subject imports.") (emphasis added), *aff'd sub nom. Armco, Inc. v. United States,* 760 F.2d 249 (Fed.Cir.1985). Even when the Commission makes a determination of "threat of material injury" it assesses the "threat of the specific indicia of *present* material injury." *Rhone Poulenc, S.A. v. United States,* 592 F.Supp. 1318, 1322 (Ct.Int'l Trade 1984) (emphasis added). If cumulation were imposed upon imports restricted by VRAs or on which CVD or dumping duties were assessed, the provision would operate to punish past acts, not those causing present injury to the domestic industry.

The dissenter fails to recognize that imports may be included in the cumulation or cross-cumulation assessment only when they are definitely determined to be dumped and to contribute to *present* material injury. The statute is written entirely in the present tense. It uses the words "compete" and "subject to." It does not say "subjec*ted* to" or "compete*d*." Yet the concurring and dissenting opinion uses "compete" in the past tense, and would mandate cumulation of goods that were at one time subject to an investigation if the goods "compete[d]" in the marketplace. Whether the policy of greater cumulation thus advocated would be the better policy is up to the Congress, not our court, to decide.

The legislative history's only *explicit* guidance is that cumulation is designed to take into account "simultaneous unfair acts." *See* H.R. Conf. Rep. No. 1156, 98th Cong., 2d Sess. 173, *reprinted in* 1984 U.S. Code Cong. & Admin.News at 5290. Accordingly, we cannot agree with the Court of International Trade that the "purposes and clearly articulated legislative intent" require cumulation of all imports preliminarily found sold at LTFV anytime during the ITC injury investigation. *Chaparral Steel,* 698 F.Supp. at 260. Because neither the statutory language nor the legislative history *conclusively* establishes the intended time frame for cumulation, we assess the agency's interpretation of the provision to determine whether it is reasonable and in accordance with the legislative purpose.

## V. *Agency's Interpretation*

■ The ITC interprets 19 U.S.C. § 1677(7)(C)(iv) (1988) not to require cumulation of imports that cannot be determined to be unfair as well as those for which antidumping or countervailing duties were imposed that negate the unfairness they were designed to offset.

In this case the ITC interpreted "subject to investigation" to include only imports still under investigation on "vote day"[6] and imports which were proven "unfair" and to have continuing impact as of vote day. The ITC did not cumulate imports from Poland and Spain because they were no longer subject to a *pending* investigation and due to the VRAs there was no possibility of being found to be unfairly traded. With respect to the subsidized imports from Spain and South Africa, the imports made before the CVD duties were imposed were not cumulated because they

---

**6.** "Vote day" is the day the ITC finally determines whether subsidized or dumped imports actually cause, or threaten, significant injury to the domestic industry for the time period under investigation.

were not marketed reasonably coincident with the Norwegian imports.

In this appeal the LTFV investigations of steel imports from Poland and Spain ended prior to the Norway investigation vote day.[7] The ITC interprets the withdrawal of the petitions due to a VRA as meaning that no unfair value determination could be made for imports entered during the ITC investigation's time frame. Thus, the ITC could reasonably exclude these imports. The ITC could also exclude the pre-CVD order imports from Spain and South Africa even though they had been found to be unfairly traded, because those imports did not contemporaneously compete with the Norwegian imports. The ITC views the imports from Spain and South Africa, that entered after the CVD orders, as not "unfair" inasmuch as they are not marketed at unfair prices because of the imposition of duties. We cannot say that the ITC was unreasonable in evaluating candidates for cumulation on the basis of their unfair trading or the effects of proven unfair trading[8] as of vote day. Nor was the ITC incorrect in finding that as of the date of determination of any material injury from Norwegian imports, "there are no imports of carbon steel structural shapes [from other countries] which satisfy the criteria for cumulation with imports from Norway." *Carbon Structural Steel Shapes from Norway*, USITC Pub. 1785, at 9.

Accordingly we defer to the agency's interpretation of the statute. *Melamine Chems., Inc. v. United States*, 732 F.2d 924, 930 (Fed.Cir.1984) (" 'The number of factors involved, complicated by the difficulty in quantification of these factors and the foreign policy repercussions of a dumping determination, makes the enforcement

of the antidumping law a difficult and supremely delicate endeavor.' " (quoting *Smith–Corona Group v. United States*, 713 F.2d 1568, 1571, 1 Fed. Cir. (T) 130, 131 (1983))). The agency's interpretation is permissible. Deference is therefore due the administering authority. *See Al Tech Specialty Steel Corp. v. United States*, 745 F.2d 632, 642 (Fed.Cir.1984) (agency's interpretation of the statute under which it operates is entitled to some deference).

## VI. *Subsequent Congressional Inaction*

■ The ITC's interpretation in this case was made in 1985 and is thus one of several years standing. Congress had two opportunities to change the cumulation rules, for example, by defining a specific time frame for the ITC to use in cumulating. The first opportunity was with the enactment of the Trade and Tariff Act of 1984, which included the Steel Import Stabilization Act and enacted the cumulation provision. *See* Trade and Tariff Act of 1984, Pub.L. No. 98–573, 98 Stat. 2948. The second was in 1988, with the passage of the Omnibus Trade and Competitiveness Act. House Bill H.R. 3, a precursor to the Omnibus Trade and Competitiveness Act of 1988, contained a provision amending 19 U.S.C. § 1677(7)(C)(iv) (1988). *See* Trade and International Economic Policy Reform Act of 1987, H.R. 3, § 154, 100th Cong., 1st Sess., 133 Cong. Rec. H2642 (daily ed. Apr. 29, 1987) (original text) [hereinafter Proposed 1987 Reform Act]. The provision was not in the bill that finally passed. *See generally* Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, 102 Stat. 1107.

---

**7.** Chaparral Steel suggested to the ITC two "candidates" for cumulation, Poland and Spain. *Carbon Structural Steel Shapes from Norway*, USITC Pub. 1785, Inv. No. 731–TA–234, at 6. However, the ITC did not limit its cumulation analysis to those two countries, but instead considered every country selling carbon steel structural shapes in the United States during the investigatory period for Norway. This included three candidates for cumulation: Poland, Spain, and South Africa. The ITC examined all three candidates in the marketplace during that period, assessed the legal consequence of events

occurring prior to vote day (i.e., terminations of investigations), and concluded "there are no imports which satisfy the criteria for cumulation with imports from Norway." *Id.* at 9.

**8.** There are no facts on the record before us to prove residual effects of unfairly traded imports that cause present injury to the domestic industry. We therefore need not determine whether any such effects have dissipated. *See Chaparral*, 698 F.Supp. at 264.

The House provision would have required the ITC to cumulate all imports that were under investigation within the twelve months prior to the final ITC determination, unless the imports were negligible. Proposed 1987 Reform Act, *supra,* at H2663. The House Report stated that an amendment was needed "to clarify when cumulation is appropriate." House Comm. on Ways and Means, Proposed 1987 Reform Act, H.R.Rep. No. 40, 100th Cong., 1st Sess., pt. 1, at 129. The House provision would have required cumulation of imports that "are subject to any investigation" or "are subject to any final order or suspension agreement" or if the imports "entered before any quantitative restraint agreement [VRA] was imposed" if the petition was withdrawn after an affirmative preliminary determination of LTFV sales. Proposed 1987 Reform Act, *supra,* at H2663. That is precisely what the dissent advocates. Congress, however, chose not to modify the cumulation provision.

Although later congressional inaction is not dispositive of congressional intent, additional deference may be given to an agency interpretation when a statutory provision remains unchanged after Congress has considered an amendment, particularly one that plainly would have reversed established agency practice on the point in issue. *See United States v. Federal Insur. Co.,* 805 F.2d 1012, 1017 (Fed.Cir.1986), *cert. denied,* 481 U.S. 1048, 107 S.Ct. 2179, 95 L.Ed.2d 835 (1987) ("[C]ongressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." (quoting *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974))).

### Conclusion

The ITC's interpretation to exclude the Spanish, South African and Polish imports from cumulation is consistent with the statutory language, legislative history, and congressional purpose. Its interpretation was not overturned by subsequent congressional action, although Congress was squarely presented with the opportunity to do so. Accordingly, the imports from Po-

land, Spain, and South Africa were properly not cumulated in determining injury to the domestic industry from Norwegian structural steel shapes. The Court of International Trade order is therefore REVERSED.

PAULINE NEWMAN, Circuit Judge, concurring in part and dissenting in part.

I agree with much of the court's analysis. However, I do not believe that the Commission was correct in refusing to cumulate the unfairly traded steel shapes from Spain and Poland with the unfairly traded structural steel shapes from Norway, for the period during which they all met the statutory requirements:

> **19 U.S.C. § 1677(7)(C)(iv) Cumulation.**—For purposes of clauses (i) [volume] and (ii) [price], the Commission shall cumulatively assess the volume and price effect of imports from two or more countries of like products subject to investigation if such imports compete with each other and with like products of the domestic industry in the United States market.

The result is that Norway, a found "dumper" at a margin of 13.7% less than fair value, *Carbon Steel Structural Shapes from Norway,* 50 Fed.Reg. 42,975 (Dep't Comm.1985), is freed of the statutorily mandated consequences of its unfair trade practices.

I believe that neither the Commission nor the Court of International Trade was entirely correct, in that the Court of International Trade identified too broad a time period for cumulation with the Norwegian imports, while the Commission's view was too narrow. In my view the Commission erred in refusing to cumulate the unfairly traded steel structural shapes imported from Norway with the unfairly traded steel structural shapes imported from Spain and Poland, for the period during which these imports were all subject to investigation.

There are three periods of time that are pertinent to this analysis, each involving different circumstances.

### A

The first time period is the period of investigation before entry of the Norwegian steel structural shapes into the United States market.

The investigation by the International Trade Administration, Department of Commerce, commenced in 1982. Imports of steel structural shapes from South Africa and from Spain in 1982 and 1983 were found to be subsidized, and countervailing duties were levied. *Certain Carbon Steel Products from South Africa,* 47 Fed.Reg. 39,379 (Dep't Comm.1982); *Certain Carbon Steel Products from Spain,* 48 Fed. Reg. 525,529 (Dep't Comm.1983). The subsidized imports on which duties were levied in 1982 and 1983 were not shown to have competed with Norwegian imports in the United States market, for the Norwegian imports first appeared in 1984 and the issue of residual market effects of these South African and Spanish imports was not raised on the record before us.

Thus I agree with the panel majority that these 1982 and 1983 South African and Spanish subsidized imports should not have been cumulated with the later Norwegian imports for the purpose of injury determination. I would reverse this part of the holding of the Court of International Trade.

### B

There was a period, starting in 1984, during which unfair imports from Norway, Spain, and Poland were all subject to investigation and were all in competition with each other and the domestic industry, thus fully meeting the statutory requirements of 19 U.S.C. § 1677(7)(C)(iv). The precise outer edges of this period of competition are not clear on the record before us; but that there exists a core period was established.

This core period is the period when unfair imports of all three countries were competing in the United States market, prior to entry by the United States into Volun-

tary Restraint Agreements with Spain and Poland. The imports from Poland were found on preliminary determination to be sold in the United States at a margin of 59.96% less than fair value. *Carbon Steel Structural Shapes from Poland,* 50 Fed. Reg. 23,329 (Dep't Comm.1985). The steel structural shapes from Spain were found on final determination to be sold at varying margins of less than fair value.[1] *Certain Carbon Steel Products from Spain,* 49 Fed.Reg. 48,582, 48,587 (Dep't Comm.1984). The imports from Norway were found on final determination to be sold at a margin of 13.7% less than fair value. *Carbon Steel Structural Shapes from Norway,* 50 Fed.Reg. 42,975 (Dep't Comm.1985). Material injury to the domestic industry was found by the Commission. *Carbon Steel Structural Shapes from Norway,* USITC Pub. 1785, p. 6, Inv. No. 731–TA–234 (Nov. 1985).

The unfair imports of these three countries, although all were present in the market during this period and thus squarely within the terms of 19 U.S.C. § 1677(7)(C)(iv), were ignored by the Commission, which held that imports from Spain and Poland were not to be counted in the injury determination with respect to the imports from Norway because the imports from Spain and Poland were no longer "subject to investigation" on the Norway "vote day". In administering § 1677(7)(C)(iv), the Commission treated the imports at less than fair value from Spain and Poland as if they had never occurred, simply by "voting" on Norway on a date after Spain and Poland had entered into Voluntary Restraint Agreements.

The Court of International Trade rejected the Commission's view that Poland, because it entered into a VRA after the preliminary determination of sales at 59.96% less than fair value, was thereby excluded from cumulation for the period before it entered into the VRA. There is logic to the position of the Court of International Trade that the absence of a final determination "affects the weight and credibility of the

---

**1.** One manufacturer had an estimated margin of 27.44%, another of zero, and the other manufac-

turers/producers/exporters an average of 16.17% less than fair value.

evidence [of dumping], not its overall relevance". That court recognized that there are various reasons why a preliminary determination might not have become final: at one extreme, further investigation might not have confirmed the calculation; and at the other extreme, as here, the dumping might have led to a Voluntary Restraint Agreement. The approach of the Court of International Trade simply took the actual circumstances into account.

It is argued that because the investigations as to Spain and Poland were terminated by VRAs, there was no final determination of injury. But the requirement of a final determination of injury is the antithesis of the purpose of the cumulation statute, which is to reach those situations where individual imports do *not* cause injury. The cumulation statute is designed to reach those situations "where the impact of imports treated individually is minimal but the combined impact is injurious", provided only that the marketing of the cumulated imports is "reasonably coincident". H.R. Rep. No. 725, 98th Cong., 2d Sess. 37, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5127, 5164.

The Spanish steel structural shapes were the subject of a final determination of sales at less than fair value. *Certain Carbon Steel Products from Spain*, 49 Fed.Reg. 48,582 (Dept.Comm.1984). Even under the Commission's requirement that there be a final determination of dumping, these imports should have been cumulated with the Norwegian imports for the period before Spain entered into a Voluntary Restraint Agreement. Since Spain was by far the largest dumper, this aspect is not insignificant.[2] Although Congress, in considering proposed versions of the Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, 102 Stat. 1107, declined to enact further rules on the details of cumulation, this can not be taken to mean that Congress intended by this inaction to restrict cumulation in accordance with the existing law.

The Court of International Trade thus correctly held that the effects of the unfairly traded Norwegian, Spanish, and Polish imports should be cumulated for the period in which they competed with each other and with the domestic industry, and for that period I would affirm the court's ruling. Injury to the domestic industry during this period was shown. The Commission's refusal to cumulate the effects of the Polish and Spanish imports with the Norwegian imports during this core period simply insulates the Norwegian imports from the reach of the statute: contrary to the intent of Congress and the plain text of § 1677(7)(C)(iv).

The appellants argue that the purpose of the trade law is to address only present and future injury, not past injury, and therefore that competing steel structural shapes imported prior to the Norwegian "vote day" are irrelevant to the statutory purpose. This argument misperceives the statute. The statute mandates that the effects of unfair trade acts, which necessarily are past acts, be cumulated to determine their combined injurious effect on the domestic industry. Past acts that caused or threatened injury, 19 U.S.C. § 1673b(a), can not be ignored in their entirety simply because the "vote day" as to injury is after some of the injurious acts were corrected prospectively by VRA's.[3] The statute requires cumulation of those acts that contributed to injury before they were corrected. The legislative purpose of the cumulation provision was "to ensure that the injury test adequately addresses simultaneous unfair imports from different countries". H.R.Rep. No. 725, *supra.* The exclusion of the Polish and Spanish unfair imports from the Norway injury test, during the period

---

2. For the year 1984 the "Ratio of imports to apparent U.S. consumption" was 1.0 for Norway, 0.9 for Poland, and 5.0 for Spain. *Carbon Steel Structural Shapes from Norway*, USITC Pub. 1785, Inv. No. 731–TA–234 (Nov. 1985).

3. The purpose of the cumulation statute is not to punish past acts. In this case cumulation can

have no effect whatsoever on Spain and Poland, for those countries' unfair imports had been corrected by VRA's. As to Norway, cumulation simply aids in the determination of injury to the domestic industry, and allows remediation of the impact of the unfair Norwegian imports.

in which they were *all* unfairly traded, is contrary to the statute and the legislative purpose.

## C

The third period of time to be considered is the period after the entry into the VRA's with Spain and Poland, when imports from these countries are no longer deemed unfairly traded.

The Court of International Trade gave weight to the residual effect of these terminated unfair trade practices in reviewing the question of cumulative injury to the domestic industry. That court referred to the "hammering effect" of unfair imports, and the concerns expressed in *City Lumber Co. v. United States*, 311 F.Supp. 340, 343 (Cust.Ct.1970), *aff'd*, 457 F.2d 991 (CCPA 1972), and in *USX Corp. v. United States*, 655 F.Supp. 487 (Ct.Int'l Trade 1987).

In view of the Commission's affirmative finding that the domestic industry "continues to be materially injured", *Carbon Steel Structural Shapes from Norway*, USITC Pub. 1785, p. 6, Inv. No. 731–TA–234 (Nov. 1985), the refusal of the Commission to consider whether there was any residual effect of the Polish and Spanish imports is not only deficient as a matter of economic analysis, but is contrary to the legislative enactment. I believe the Court of International Trade was correct in its holding that residual effects, if any, should be considered in the determination of whether the Norwegian sales at less than fair value contributed to cumulative injury, for any portion of the period after Spain and Poland entered into the VRAs.