## Ceramica REGIOMONTANA, S.A., Plaintiff–Appellant,

and

**Ceramicas y Pisos Industriales de Culiacan, S.A. de C.V. and Industrias Intercontinental, S.A., Plaintiffs,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 95–1026.

United States Court of Appeals, Federal Circuit.

Sept. 6, 1995.

Steven P. Kersner, Ross & Hardies, Washington, DC, argued for, plaintiff-appellant. With him on the brief were Jeffrey S. Neeley and Roger Banks.

Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Department of Justice, argued, for defendant-appellee. With her on the brief were Frank W. Hunger, Assistant Attorney General and David M. Cohen, Director. Also on the brief were Stephen J. Powell, Chief Counsel for Import Administration, Berniece A. Browne, Senior Counsel, and Boguslawa B. Thoemmes, Attorney–Advisor, Office of the Chief Counsel for Import Administration, Department of Agriculture.

Before NEWMAN, CLEVENGER, and RADER, Circuit Judges.

Opinion of the court filed by Circuit Judge RADER. Dissenting opinion filed by Circuit Judge CLEVENGER.

RADER, Circuit Judge.

Ceramica Regiomontana, S.A., Ceramicas y Pisos Industriales de Culiacan, S.A. de C.V., and Industrias Intercontinental, S.A.

(collectively Ceramica) challenged the International Trade Administration's (ITA's) imposition of duties on ceramic tile imported after April 23, 1985, in the United States Court of International Trade. The Court of International Trade denied the challenge. *Ceramica Regiomontana, S.A. v. United States,* 853 F.Supp. 431, 439 (Ct.Int'l Trade 1994) (*Ceramica I* ). Ceramica appeals from the Court of International Trade's entry of final judgment. *Ceramica Regiomontana, S.A. v. United States,* 861 F.Supp. 150 (Ct. Int'l Trade 1994) (*Ceramica II* ). Because ITA lacked statutory authority to impose these countervailing duties, this court reverses and remands.

## BACKGROUND

The United States countervailing duty laws protect domestic industries from unfair foreign competition. When a foreign government provides a subsidy to a foreign importer for the manufacture, production, or export of goods, ITA may impose a countervailing duty on imports of those goods. 19 U.S.C. § 1671(a) (1988), *as amended by* Uruguay Round Agreements Act, Pub.L. No. 103–465, § 262, 108 Stat. 4809, 4910 (1994). The countervailing duty equals the amount of the subsidy. *Id.*

Before ITA may impose countervailing duties, the International Trade Commission (ITC) must make an affirmative injury determination. *Id.* ITC must find that the imports caused, or threatened to cause, material injury to a domestic industry, or that the imports materially retarded the establishment of a domestic industry. *Id.*

Before 1980, Title 19 did not require an injury determination for dutiable goods. *See* Tariff Act of 1930, ch. 497, § 303, 46 Stat. 590, 687, *as amended by* Trade Act of 1974, Pub.L. No. 93–618, § 331(a)(1), 88 Stat. 1978, 2049 (1975) (codified as amended at 19 U.S.C. § 1303(a)(1) (1976)). An early version of the countervailing duty law provided:

> Whenever any country ... shall pay or bestow ... any bounty or grant upon the manufacture or production or export of

any article or merchandise manufactured or produced in such country ... then upon the importation of such article or merchandise into the United States ... there shall be levied and paid ... in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.

19 U.S.C. § 1303(a)(1) (1976).

The Trade Act of 1974 authorized the President to negotiate an international subsidies code with the United States' trading partners to set uniform conditions for imposing countervailing duties. Trade Act of 1974, § 102(b), 88 Stat. at 1982–83. The Subsidies Code, signed in 1979, arose out of the Tokyo Round of the General Agreement on Tariffs and Trade (GATT) negotiations (1973–1979). *See* Agreement of Interpretation and Application of Articles VI, XVI, & XXIII of the GATT (Subsidies Code), *reprinted in* II Bruce E. Clubb, *United States Foreign Trade Law* 648–49 (1991). Article VI of the GATT requires a finding of material injury to a domestic industry before imposition of countervailing duties. The General Agreement on Tariffs and Trade, Oct. 30, 1947, art. VI, § 6(a), *reprinted in Law and Practice Under the GATT,* ch. I.A., at 14 (Kenneth R. Simmonds & Brian H.W. Hill eds. 1994). By acceding to the Subsidies Code, the United States agreed to incorporate GATT's Article VI material injury requirement into its national countervailing duty law for all proceedings involving its signatory partners. Subsidies Code, art. I, *reprinted in* Clubb, *supra,* at 650.

In 1979, Congress amended the countervailing duty laws to comply with United States obligations under the Subsidies Code. Trade Agreements Act of 1979, Pub.L. No. 96–39, 93 Stat. 144 (codified as amended in scattered sections of 19 U.S.C.) (the 1979 Act). The 1979 Act, however, left the existing countervailing duty law in place, in amended form, to apply to countries that did not sign the Subsidies Code or an equivalent agreement. 19 U.S.C. § 1303(a)(1) (1988) (repealed 1994).* The 1979 Act amended

---

* Congress repealed 19 U.S.C. § 1303 effective January 1, 1995. Uruguay Round Agreements Act,

Pub.L. No. 103–465, § 261(a), 108 Stat. 4809,

section 1303(a)(1) to specifically exclude any "article or merchandise which is the product of a country under the Agreement." 1979 Act, § 103(a), 93 Stat. at 190.

For "countries under the Agreement," the 1979 Act provided a new statutory provision for imposition of countervailing duties. 1979 Act, § 701, 93 Stat. at 151 (codified at 19 U.S.C. § 1671). This provision applies to countries that signed the Subsidies Code or have since assumed substantially equivalent obligations by agreement with the United States. 19 U.S.C. § 1671(a) (setting forth requirements for imposing countervailing duties); 19 U.S.C. § 1671(b) (defining "country under the Agreement"). Thus, as of 1980, and during the time at issue in this case, the United States had two standards for countervailing duties: section 1671 for "countries under the Agreement" and section 1303 for all others.

The major difference between the two standards of title 19 is the injury determination requirement. Section 1303 authorizes imposition of countervailing duties without an injury determination. 19 U.S.C. § 1303(a)(1), (b). Section 1671, however, bars imposition of countervailing duties until after ITC makes an injury determination. 19 U.S.C. § 1671(a).

In 1982, ITA issued a countervailing duty order on ceramic tile imported from Mexico. *Final Affirmative Countervailing Duty Determination; Ceramic Tile from Mexico and Countervailing Duty Order*, 47 Fed.Reg. 20,-012 (Dep't Comm.1982). Because Mexico was not at that time a "country under the Agreement" within the meaning of 19 U.S.C. § 1671(b), ITA issued the order under section 1303. *See id.* at 20,015. Accordingly, ITC did not conduct a material injury determination.

On April 23, 1985, Mexico and the United States signed the Understanding Between the United States and Mexico Regarding Subsidies and Countervailing Duties (the Understanding). Effective on that date, the United States Trade Representative officially designated Mexico a "country under the Agreement." *Determination Regarding the*

4908 (1994). Repeal of this section, however,

*Application of Certain International Agreements*, 50 Fed.Reg. 18,335, 18,335–36 (U.S. Trade Rep.1985).

On June 29, 1988, ITA initiated an administrative review of the 1982 Order. *Initiation of Antidumping and Countervailing Duty Administrative Reviews; Construction Casting From Brazil*, 52 Fed.Reg. 23,330, 23,330–31 (Dep't Comm.1987). This review covered entries of ceramic tile imported between January 1, 1986 and December 31, 1986. *Id.* ITA published its final results in 1989. *Ceramic Tile From Mexico; Final Results of Countervailing Duty Administrative Review*, 54 Fed.Reg. 19,930 (Dep't Comm.1989). ITA determined that Ceramica owed countervailing duties for tile imported during the review period and instructed Customs to assess the duties. *Id.* at 19,932.

Ceramica challenged the final results in the Court of International Trade. Ceramica argued that ITA lacked authority to impose the countervailing duties on tile imported after April 23, 1985—the date Mexico became a "country under the Agreement." Once Mexico became a "country under the Agreement," Ceramica asserted, ITA could only assess duties under section 1671. Section 1671 requires an injury determination. Because ITC had not conducted an injury determination, Ceramica concluded that ITA must revoke the outstanding countervailing duty order as of April 23, 1985.

The Court of International Trade denied Ceramica's challenge and remanded on different grounds. *Ceramica I*, 853 F.Supp. at 439. After consideration of ITA's remand results, the Court of International Trade entered final judgment dismissing the case. *Ceramica II*, 861 F.Supp. at 150. Ceramica appeals.

## DISCUSSION

The issue on appeal is whether ITA has authority to impose countervailing duties on ceramic tile imported from Mexico after April 23, 1985—the date Mexico became a "country under the Agreement" as defined by section 1671(b)—absent an injury determination. Put another way, this court must

does not affect the outcome of this appeal.

decide whether Mexico's change in status to a "country under the Agreement" deprives ITA of statutory authority to assess duties on ceramic tile imported after the status change, based on an order properly issued before the status change under section 1303(a)(1).

■ This court reviews issues of statutory interpretation *de novo*. *Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1100, 8 Fed.Cir. (T) 101, 105 (1990). "If the statutory language is clear, then 'that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Id.* at 1101 (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)).

Section 1303(a)(1) of Title 19 authorizes ITA to impose countervailing duties on dutiable goods imported from certain countries. 19 U.S.C. § 1303(a)(1). Section 1303(a)(1) specifically excepts goods imported from "countr[ies] under the Agreement" from its scope:

> Except in the case of an article or merchandise which is the product of a country under the Agreement (within the meaning of section 1671(b) of this title), whenever any country ... shall pay ... any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country ... then *upon the importation* of such article or merchandise into the United States ... there shall be levied and paid ... a duty equal to the net amount of such bounty or grant, however the same shall be paid or bestowed.

*Id.* (Emphasis added.)

■ By its language, section 1303(a)(1) ceases to operate as authority for countervailing duties on goods imported after the importing country has become a "country under the Agreement." The language of section 1303(a)(1) links the importing country's status—which is determinative of the section's applicability—to the time of importation of goods under review. As recited in the statute, except for goods imported by a coun-

try under the Agreement, ITA shall levy a duty "upon the importation" of subsidized goods. Countervailing duties are imposed upon entry or importation of goods, not upon issuance of the original countervailing duty order. *See Cementos Guadalajara, S.A. v. United States*, 686 F.Supp. 335, 351 (Ct.Int'l Trade 1988), *aff'd.*, 879 F.2d 847, 848, 7 Fed. Cir. (T) 113, 114 (1989), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990). It is at this time—the time of importation of the goods—that ITA must evaluate whether a country is a "country under the Agreement" to determine whether section 1303 or section 1671 applies.

■ Mexico became a "country under the Agreement" on April 23, 1985. Ceramic tile imported after that date falls outside the scope of section 1303(a)(1). Ceramica imported the ceramic tile under review between January 1, 1986 and December 31, 1986. Because that ceramic tile entered after Mexico's recognition as a "country under the Agreement," section 1303(a)(1) does not apply.

Any other reading of section 1303(a)(1) would lead to the absurd conclusion that a country with outstanding countervailing duty orders would have to pay duties on those orders potentially in perpetuity, even after becoming a "country under the Agreement." A valid countervailing duty order under section 1303 does not establish a legal basis for imposition of duties into perpetuity. Rather, the importation of goods during the year in review triggers the duties. *Cementos Guadalajara*, 686 F.Supp. at 351 ("That the liability for duties is established at the time of entry of the goods into the United States has been recognized as an axiom of countervailing duty law.").

After Mexico became a "country under the Agreement," the only provision under which ITA could continue to impose countervailing duties was section 1671. Section 1671 requires ITC to conduct an injury determination. 19 U.S.C. § 1671(a)(2). ITC, however, did not conduct an injury determination in connection with the subject administrative review. Thus, this court holds that neither section 1303(a)(1) nor section 1671 authorized Commerce to collect duties on ceramic tile imported from Mexico after April 23, 1985.

The 1979 Act included transition rules. 1979 Act, § 104, 93 Stat. at 190–93 (codified at 19 U.S.C. § 1671 note (1988)). The transition rules addressed countervailing duty orders in effect on January 1, 1980, for countries under the Agreement. 1979 Act, § 104(b), 93 Stat. at 191–92. The countervailing duty order against Mexico's ceramic tile imports issued in 1982. Thus, the transition rules do not apply in this case.

Moreover, the clear language of section 1303(a)(1) trumps any language contained in the Understanding. *See Cementos Anahuac del Golfo, S.A. v. United States*, 689 F.Supp. 1191, 1211 (Ct.Int'l Trade 1988) ("United States countervailing duty law is the source of direction and guidance in this [countervailing duty] matter."), *aff'd., Cementos Guadalajara, S.A. v. United States*, 879 F.2d 847, 848, 7 Fed.Cir. (T) 113, 114–15 (1989), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990). The only effect attributable to the Understanding is to change Mexico's status to that of a "country under the Agreement." Title 19 governs the imposition of countervailing duties.

In sum, when Mexico attained the status of a "country under the Agreement," section 1303 no longer applied because Congress expressly limited that statute to countries other than those under the Agreement. The only statutory authority upon which Congress could impose duties was section 1671. Without the required injury determination, Commerce lacked authority to impose duties under section 1671. *See* 19 U.S.C. § 1671(a)(2).

## CONCLUSION

Because Commerce lacks statutory authority to impose countervailing duties on goods imported by Mexico after April 23, 1985, this court reverses and remands with instructions to revoke the 1982 Order effective April 23, 1985, and to refund to Ceramica any duty deposits at issue in this case.

## COSTS

Each party shall bear its own costs.

**REVERSED AND REMANDED.**

CLEVENGER, Circuit Judge, dissenting.

This case involves a countervailing duty order issued in 1982, at a time when Mexico was not a "country under the Agreement", and hence at time when the products at issue here, dutiable ceramic tile, were lawfully subjected to countervailing duties without any injury determination having been made. Mexico became a "country under the Agreement" in 1985. As a result of an administrative review of calendar 1986, which did not include an injury determination for the review period, Customs assessed countervailing duties against Ceramica under the 1982 order.

The court holds that the United States—absent an injury determination—may not levy and collect these countervailing duties, even though assessed pursuant to a valid countervailing duty order. I read the court to say that it reaches this conclusion under the plain meaning of two statutes, 19 U.S.C. §§ 1303 and 1671. The authority to levy countervailing duties without making injury determinations ceases on the day a country becomes one "under the Agreement", for exports made after that date. The only authority under which dutiable imports from Agreement countries can be subjected to countervailing duties is then found in section 1671. Since section 1671 speaks only of duties that "shall be imposed" after, *inter alia*, an injury determination is made, and does not distinguish between countervailing duties imposed for the first time under a section 1671 countervailing duty order and duties imposed as a result of administrative reviews of a section 1303 order which conclude that duties under the original order must be continued, the court concludes that *any* countervailing duty imposed on exports from an Agreement country is a section 1671 duty. Without saying so explicitly, the court decides as a matter of statutory construction that the word "imposed" in section 1671 means imposed in any fashion on imports made after a country becomes an Agreement country, as opposed to imposed by an initial countervailing duty order issued after a country becomes an Agreement country, pursuant to all the requirements of section 1671.

The court's result seems to make eminent good sense, but it is in tension with the history of the statutes, which includes the transition statute mentioned in passing by the court. The court's failure to come to grips with the meaning and purpose of the transition statute is for me its Achilles' heel.

When Congress enacted section 1671 in 1979, there were many outstanding countervailing duty orders affecting imports from many countries. At the same time, the United States was eager to encourage countries not yet acceding to the Subsidies Code (mentioned by the court) to do so promptly, either directly or by Agreement with the United States, so as to entitle dutiable imports from their countries to the benefit of injury determinations before imposition of countervailing duties by the United States. As an inducement to that end, Congress wrote transition rules in section 104(b) of the 1979 Act, which affected outstanding countervailing duty orders. Those statutory transition rules provided that if a country became an Agreement country before January 1, 1980, its government, and in some limited circumstances even its exporters, could request that an injury determination be made on countervailing duty orders issued before January 1, 1980. The request could be made within three years after the effective date of the 1979 Act, and if the injury determination was negative, then the countervailing duty order would be revoked and no countervailing duties would be collected from the date of receipt of the request. 93 Stat. 191–92. Of course, the transition statute does not *apply* to this case, which involves a post January 1, 1980, countervailing duty order. But whether the transition statute applies to this case is not the question. The question is whether the transition statute teaches us that the court's interpretation of sections 1303 and 1671 is incorrect.

The transition rule statute on its face demonstrates that Congress had its eye on the situation presented by this case, and indeed sought to use the threat of continuation of duties levied under orders lacking injury determinations to nudge countries into the GATT fold. Beyond the face of the statute, its legislative history speaks directly to the matter at hand: "Selective application of section [1671] is intended to encourage countries to assume the obligations of the agreement. . . ." S.Rep. No. 249, 96th Cong., 1st Sess. 45 (1979) U.S.C.C.A.N. 1979, pp. 381, 431.

The court's holding in this case nullifies this aspect of the statutory transition rules. Under the court's holding, there is no need for a new Agreement country to request an injury determination within three years after becoming a signatory country, because the preexisting countervailing duty order becomes unenforceable immediately upon signing an Agreement, and remains so until the United States initiates and completes a new investigation under section 1671. In addition to the nullification of a statute, the court's holding further concludes that the statute nullified was itself unlawful, since it mistakenly conditioned the right to an injury determination, when Congress in the same statute in 1979 enacted the unconditional right to an injury determination. In my view, the court double faults at match point on the transition statute.

In fairness to the court and Ceramica's brief, however, another reading of the effect of the transition statute is possible. Section 104(c) of the transition rules, 93 Stat. 192, provided that existing orders would remain in effect and thus avoid being declared inoperable. According to Ceramica, this transition provision was necessary to validate preexisting countervailing duty orders that would have been inoperative on this court's reasoning in this case. To its credit, however, Ceramica concedes the softness of its argument by noting that, under the transition rules, exporters whose countries did *not* request injury determinations would be left exposed to imposition of duties under the old-non-injury-determination orders.

I thus have problems with the court's holding. I think that the meaning of the two statutes themselves leaves uncertain whether every countervailing duty imposed on entries after a country signs an Agreement, in the circumstances of this case, is a duty "imposed" under section 1671, as opposed to a duty levied under a preexisting Section 1303 lawful countervailing duty order. Given

some ambiguity in the statutes themselves, fuelled quite considerably by the nullification of another statute to reach the court's conclusion, I would conclude that the government retains the right to levy under old countervailing duty orders, without making injury determinations, in the factual circumstances of this case. Were I writing for the court instead of for myself, I would lay out the *Chevron* doctrine, and explain why this is an apt case for its application, given the failure of Congress to have directly answered the question at bar in the statute, and the expertise and authority of the particular administrative agency to fill in the legislative gap, especially when so well guided by the history of the statutes involved.

Although I find fault with the court's decision in this case, I am unable to determine if this case matters much to the government. I assume that we will hear from the United States by way of a petition for rehearing if recent developments under GATT will be severely compromised by this decision, or if the consequences to the fisc or our international relations will be significantly impaired by our holding. As yet, we have no signal that this is anything more than a garden variety case of statutory interpretation, in which one judge parts company respectfully with two respected colleagues.