Slip Op. 03 - 86

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - -x

FRONTIER INSURANCE COMPANY,       :
A New York Corporation,
REAL PARTY IN INTEREST,         :

                  Plaintiff, :

         v.            : Court No. 95-08-01041

THE UNITED STATES,           :

                 Defendant. :

- - - - - - - - - - - - - - - - - - -x

Opinion

[Upon motions as to assessment of duties on
 imports of lizard skins from Argentina,
 summary judgment for the defendant.]

Decided:  July 17, 2003

Law Offices of Elon A. Pollack, a P.C. (Elon A. Pollack and Xinyu Li) for the plaintiff.

Peter D. Keisler, Assistant Attorney General; John J. Mahon, Acting Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Amy M. Rubin); Office of Assistant Chief Counsel, International Trade Litigation, U.S. Bureau of Customs and Border Protection (Paula S. Smith), of counsel, for the defendant.

AQUILINO, Judge:  The amended complaint filed on behalf of Frontier Insurance Company, a surety alleged to be the real party in interest, prays, among other things, for judgment

> overruling the appraisement, classification, and liquidation and . . . directing the reliquidation of the merchandise described on the entries involved herein, and for refund of duties accordingly,

based upon pleaded claims that that merchandise should have been

classified either under (1) subheading 4107.29.30 or (2) 4103.20.00 of the Harmonized Tariff Schedule of the United States ("HTSUS") (1992) rather than the subheading 4107.29.60 decided upon by the U.S. Customs Service. Plaintiff's third pleaded cause of action is to the effect that the entries at issue should not have been assessed duties pursuant to the <u>Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Leather From Argentina</u>, 55 Fed.Reg. 40,212 (Oct. 2, 1990), of the International Trade Administration, U.S. Department of Commerce ("ITA").

I

Since joinder of issue on these claims, the plaintiff has interposed a uniquely-styled Motion for Summary Adjudication of Issue(s)[1]. On its part, the defendant has filed a "cross-motion" for summary judgment. These submissions each contain statements of facts alleged to be material yet not engendering issues requiring trial within the meaning of USCIT Rule 56(i), which since their filings has been relettered *(h)*. Plaintiff's Separate Statement of Undisputed Material Facts is as follows:

---

[1] In fact, the plaintiff specifically objects to defendant's characterization of this motion as one for summary judgment or partial summary judgment. <u>See</u> Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Summary Adjudication and Memorandum in Opposition to Defendant's Cross-Motion for Summary Judgment [hereinafter "Plaintiff's Reply"], p. 2, n. 1.

1. The reptile[2] skins in issue were entered into the United States between the dates of September 30, 1992 and December 23, 1992.  . . .

2. Customs classified the reptile skins under HTSUS 4107.29.60 as [] "fancy leather," at a rate of 2.4% ad valorem, and assessed countervailing duties in the amount of 14.9% ad valorem . . ..

3. The importer of record timely filed a protest to challenge Customs' classification and assessment of countervailing duties on the grounds that the skins should be classified under HTSUS 4107.29.30 at a rate of 5% ad valorem, or HTSUS 4103.20.00 "free of duty." . . .

4. Frontier timely paid the liquidated duties, including the countervailing duties, for all the entries which are the subject of this civil action, except Entry Nos. 328-0071094-2, 328-0070064-6, and 328-0071779-8. Frontier paid $3003.70 of the liquidated duties including countervailing duties for Entry No. 328-0071094-2. . . .

5. On August 9, 1995, . . . Frontier, the importer's surety and real party in interest, timely filed the instant action, after Customs denied the importer of record's protest.  . . .

6. By notice published in the Federal Register on August 1, 1997 . . . Commerce retroactively revoked its countervailing duty order on leather including lizard skins from Argentina.

7. According to the terms of the revocation notice, the Commerce Department found that the case of Ceramica Regiomontana v. United States, 64 F.3d 1579, 1582 (Fed. Cir. 1995) applied to its countervailing duty orders against Argentina.

8. . . . Commerce ". . . determine[d] that based upon . . . Ceramica, it does not have the authority to assess countervailing duties on entries of merchandise covered by these orders occurring on or after September 20, 1991."  . . .

---

2 Papers filed in this matter refer to *Tupinambis tequixin*, the tegu lizard of Colombia and north-central South America, whereas the court notes in passing that the much-rarer tegu lizard of Argentina is *Tupinambis merianae*.  Perhaps, the skinning of one species spares the skinning of the other.

9. All of the merchandise which is the subject of this case was entered after September 20, 1991. . . .

Citations omitted.

The defendant admits paragraphs 1 and 4 through 9; it also admits material aspects of paragraphs 2 and 3.  Defendant's Statement of Additional Material Facts as to Which There Are No Genuine Issues to be Tried is:

1. At the time of entry, the countervailing duty order on Argentine leather was in effect.

2. No party sought review of the order for the period from January 1, 1992 through December 31, 1992.

3. . . . Commerce issued liquidation instructions for the period from January 1, 1992 through December 31, 1992 on December 14, 1993.

4. The entries were liquidated in accordance with Commerce's liquidation instructions . . ..

None of these averments is controverted by the plaintiff. However, it does claim that a genuine issue of material fact exists, which it summarizes as "whether the reptile skins were 'fancy' or 'not fancy' at the time of entry."  Plaintiff's Reply, p. 13.  See generally id. at 11-13.

II

That issue is indeed of genuine moment.  As discussed hereinafter, it is the linchpin to this action.

The headings of HTSUS chapter 41, which encompasses "Raw Hides and Skins (Other Than Furskins) and Leather", not surpris-

ingly, commence with raw hides and skins of bovine and equine animals (4101) and then cover raw skins of sheep or lambs (4102), other raw hides and skins (4103), leather of bovine and equine animals "without hair on" (4104), sheep or lamb skin leather "without wool on" (4105), goat or kidskin leather (4106), leather of other animals "without hair on" (4107), etc.  Plaintiff's merchandise caused Customs to stop at that last heading, in particular subheading 4107.29.60 thereunder, to wit:

Leather of other animals, without hair on . . .:

* * *

Of reptiles:

* * *

Other:

* * *

Fancy ................... 2.4%[.]


A

Plaintiff's first pleaded cause of action would have the court settle on the line above this subheading, at 4107.29.30 in the Schedule, which applies to "Not fancy" reptile leather, albeit at a duty rate of five percent *ad valorem*, or more than double the rate Customs collected.

The Tariff Act of 1930, as amended, and the Customs Courts Act of 1980 entail significant waiver of the sovereign U.S. government's immunity, but those and other, related acts of

Congress do not (and could not) waive the requirement of Article III of the Constitution that this Court of International Trade only hear and decide genuine cases and controversies. See, e.g., 3V, Inc. v. United States, 23 CIT 1047, 1048-49, 83 F.Supp.2d 1351, 1352-53 (1999), and cases cited therein.

Of course, genuine cases and controversies with the Service, which recently has become the Bureau of Customs and Border Protection, can and often do involve matters that are not just monetary. Stated another way, their judicial resolution often leads to equitable and/or other relief not measured in dollars and cents. But this is not possible here. As quoted above, plaintiff's amended complaint seeks "refund of duties". Moreover, the party pressing this prayer is a surety, which makes no showing in its papers at bar of any interest in this action other than financial. Ergo, this court has no authority to grant relief upon plaintiff's first cause of action, asserted on its own.

B

The refund for which the plaintiff prays would include, however, the countervailing duties collected pursuant to the ITA's order, supra, the ambit of which seemingly has motivated counsel to press for classification under HTSUS subheading 4107.29.30 (as opposed to 4107.29.60) with its concomitant higher rate of duty. That is, the ITA specifically excluded from the order's coverage the "not fancy reptile leather" contemplated by plaintiff's pre-

ferred subheading.  See 55 Fed.Reg. at 40,213 (Scope of Investigation).  Hence, given the magnitude of additional, countervailing duties assessed pursuant to that order, 14.97 percent *ad valorem*, plaintiff's third alleged cause of action is at least a mathematical case or controversy.  It is comprised of two claims, namely, the underlying goods upon entry were not fancy within the meaning of HTSUS subheading 4107.29.30, and Customs should not have collected countervailing duties on them.

(1)

The court's subject-matter jurisdiction for matters of classification under the HTSUS is pursuant to 28 U.S.C. §§ 1581(a), 2631(a).  And, in light of the facts recited above, the court concludes that it can resolve the issue of the classifiable nature of the goods imported and also that it can do so by way of summary judgment.  While that issue, as posited by the plaintiff, supra, is definitely the material one, it is not exclusively a matter of fact, given the existing law referred to hereinafter.  Moreover, the court finds sufficient evidence already on the record via the parties' cross-motions to "determine 'whether the government's classification is correct, both independently and in comparison with the importer's alternative.'"  H.I.M./Fathom, Inc. v. United States, 21 CIT 776, 778, 981 F.Supp. 610, 613 (1997), quoting Jarvis Clark Co. v. United States, 733 F.2d 873, 878, reh'g denied, 739 F.2d 628 (Fed.Cir. 1984).  In other words, trial is not necessary because the court is unable to conclude that the parties'

factual disagreement is "such that a reasonable trier of fact could return a verdict against the movant"[3] government.

Analysis of an issue of classification is a two-step process.  First, the court must ascertain "the proper meaning of specific terms in the tariff provision".  David W. Shenk & Co. v. United States, 21 CIT 284, 286, 960 F.Supp. 363, 365 (1997).  That meaning is a question of law, and the court proceeds *de novo* pursuant to 28 U.S.C. §2640.  E.q., Russell Stadelman & Co. v. United States, 23 CIT 1036, 1037, 83 F.Supp.2d 1356, 1357 (1999), aff'd, 242 F.3d 1044 (Fed.Cir. 2001).  Second, the court must determine under which of those tariff terms the subject merchandise falls.  See, e.q., Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1365 (Fed.Cir. 1998).  This determination is also, ultimately, a question of law. Id.  Summary judgment is appropriate "when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is".  Id.  Although there is a statutory presumption of correctness that attaches to the factual aspects of classification decisions by Customs per 28 U.S.C. §2639(a)(1), that presumption does not apply where the court is presented with a question of law by a proper motion for summary judgment. See, e.q., Universal Elecs., Inc. v. United States, 112 F.3d 488, 492 (Fed.Cir. 1997).

---

[3] Ugg Int'l, Inc. v. United States, 17 CIT 79, 83, 813 F.-Supp. 848, 852 (1993), quoting Pfaff American Sales Corp. v. United States, 16 CIT 1073, 1075 (1992).

The General Rules of Interpretation ("GRI") of the HTSUS govern classification. See, e.g., Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed.Cir. 1999). According to GRI 1, "for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes". E.g., Vanetta U.S.A. Inc. v. United States, 27 CIT ___, ___, Slip Op. 03-67, p. 8 (June 25, 2003), citing Orlando Food Corp. v. United States, 140 F.3d 1437, 1440 (Fed.Cir. 1998). Only after construing the language of a particular HTSUS heading should the court turn to an examination of its subheadings. See GRI 1, 3, 6. If the meaning of a term is not defined therein or in its legislative history, the correct one is its common meaning. See, e.g., Pillowtex Corp. v. United States, 171 F.3d 1370, 1374 (Fed.Cir. 1999). To determine that common meaning, "the court may rely upon its own understanding of the terms used, and it may consult lexicographic and scientific authorities, dictionaries, and other reliable information". Baxter Healthcare Corp. of Puerto Rico v. United States, 182 F.3d 1333, 1338 (Fed.Cir. 1999), quoting Brookside Veneers, Ltd. v. United States, 847 F.2d 786, 789 (Fed.Cir. 1988). The term's common and commercial meanings are presumed to be the same. See, e.g., Carl Zeiss, Inc. v. United States, 195 F.3d at 1379.

Here, the parties agree that the lizard skins were treated prior to entry. In its Protest No. 2402-94-100028, the

importer indicates that the skins had been drum-dyed.[4] The defend-
ant argues that drum-dyeing cannot proceed until skins have been
tanned. See Defendant's Cross-Motion for Summary Judgment, p. 30.
According to Sharphouse, Leather Technician's Handbook, pp. 6-7
(1971), leather processing occurs in three stages. During the
first phase, designated "Before Tannage", the skin of an animal is
removed; it is washed, cured, limed, dehaired (if necessary),
defleshed, de-limed, and then pickled, drenched, or soured.
During the second stage, called "Tannage", that skin is tanned by
whatever method is appropriate for the type involved. The final
phase is "After Tannage", during which the tanned leather may be
dyed, fatliquored, dried, and finished.[5]

---

[4] See Defendant's Cross-Motion for Summary Judgment, Exhibit
A. During drum-dyeing, leather that has undergone tanning is ro-
tated in a drum containing hot water, dye and acid or "fatliquor"
solutions. The mechanical action of spinning, in much the same
manner as a conventional clothes-washing machine, provides pene-
tration of the dye(s) into the leather, thereby coloring it. The
process is "used on most types of leather with the exception of
those which may suffer from the vigorous action, e.g., very thin
tender skins may be torn, [or] snake skins or bellies may knot
up". Sharphouse, Leather Technician's Handbook, p. 215 (1971).

[5] Despite this well-known, common processing, plaintiff's
second alleged cause of action is to the effect that the lizard
skins herein can be classified under HTSUS heading 4103, which
states:

Other raw hides and skins (fresh, or salted, dried,
limed, pickled or otherwise preserved, but not tanned,
parchment-dressed or further prepared), whether or not
dehaired or split . . .[.]

On its face, this heading is inapposite since drum-dyeing
occurred after those skins had been tanned. Thus, the GRI pre-
clude further consideration of plaintiff's alternative classi-
fication under HTSUS subheading 4103.20.00.

Having determined that HTSUS heading 4103 does not cover this case, the court turns to heading 4107, which both parties accept to the six-digit level of 4107.29. Concurring in their judgment, the court must determine whether "Not fancy" per subheading 4107.29.30 better classifies plaintiff's merchandise than does "Fancy" of subsequent subheading 4107.29.60.

Additional U.S. Note 1 to HTSUS chapter 41 defines the term

> "<u>fancy</u>" as applied to leather [to] mean[] leather which has been embossed, printed or otherwise decorated in any manner or to any extent (including leather on which the original grain has been accentuated by any process . . .).

Underscoring in original. In this matter, at the request of the importer for "further review"[6], the Customs laboratory in New Orleans examined the lizard skins at issue under a stereo microscope and found that they "ha[ve] a coating accentuating the grain on the surface" and were thus "fancy by tariff definition". See Defendant's Cross-Motion for Summary Judgment, Exhibit C, first page. Based on this finding, the Service determined, and the defendant presses now, that those skins were "otherwise decorated" within the meaning of this Additional Note 1.

The plaintiff counters that there remains an open and unresolved question of fact as to whether the "coating" was suffi-

---

[6] <u>See</u> Defendant's Cross-Motion for Summary Judgment, Exhibit B.

cient to constitute decoration or accentuation of the grain of the lizards' skins. See generally Plaintiff's Reply, pp. 11-13. According to the plaintiff, that was not sufficient, whereupon it is suggested that the entries were "crust"[7], which has been classified in one administrative decision as "not fancy"[8], and that the coating may be "merely a method of preservation from putrefaction"[9]. See id. at 12-13. The plaintiff cites Leather's Best, Inc. v. United States, 708 F.2d 715 (Fed.Cir. 1983), for the general proposition that courts require processing that is more than "slight" before an entry can be classified as "fancy". The court in that case, as the plaintiff itself points out, required merely a "scintilla" of evidence of decoration. 708 F.2d at 718 ("the process made [the leather] 'brighter,' which we consider to be at least a scintilla of decoration, all that is required").

To repeat, Additional U.S. Note 1 provides for leather that has been "otherwise decorated in any manner or to any ex-

---

[7] "Crust" is defined as "10. Leather Manuf. The state of sheep or goat skins when merely tanned and left rough preparatory to being dyed or coloured", The Oxford English Dictionary, vol. IV, p. 88 (2d ed. 1989), and "6: the state of rough-tanned skins before they are dyed". Webster's Third New International Dictionary, p. 547 (1981). "Crust" has also been defined as "leather that has been tanned but not finished". Thorstensen, Practical Leather Technology, p. 318 (3rd ed. 1985).

[8] See NY C80873 (Nov. 7, 1997).

[9] "PUTREFACTION is the result of bacterial growth which promptly starts once an animal is dead, especially on the exposed flesh side of the flayed skin, unless it is properly cured". Sharphouse, Leather Technician's Handbook, p. 20 (1971).

tent"[10], which includes "leather on which the original grain <u>has</u>
<u>been accentuated by any process</u>"[11].  It does not specify the type
of process or coating used, nor does it refer to the extent to
which the respective process has been employed.  Dyeing, by defini-
tion, advances the leather beyond crust, and embellishes through a
change in color, often profoundly.  This court cannot find that
such change does not amount to decoration and that this process did
not accentuate the grain of the skins.  Indeed, the scrutiny of the
coating by the Customs laboratory that found it accentuated their
grain bolsters this inability.  Undoubtedly, these two factors,
together or individually, constitute a "mere scintilla" of evidence
that the lizard skins are decorated and therefore "fancy".
Whereupon, this court holds the dyed, lizard-skin leather underly-
ing this matter to be decorated and thus "fancy" within the meaning
of HTSUS subheading 4107.29.60.

(2)

Were the correct classification "not fancy", as the
plaintiff postulates, its merchandise would not have been within
the scope of the ITA's countervailing-duty investigation, given
that agency's specific exclusion of such reptile leather covered by

---

[10] Emphasis added.  To "decorate" is "to furnish or adorn
with something becoming, ornamental or striking: EMBELLISHMENT".
Webster's Third New International Dictionary, p. 587 (1981).
"Embellish" is defined, in part, as "1: to make beautiful".  <u>Id</u>.
at 739.

[11] Emphasis added.  "Accent" is defined as "3 a: to give
prominence to or increase the prominence of: make more emphatic,
noticeable, or distinct...INTENSIFY, SHARPEN".  Webster's Third
New International Dictionary, p. 10 (1981).

HTSUS subheading 4107.29.30.  But plaintiff's experienced counsel doubtless know that Commerce's reference to or reliance on the Tariff Schedule does not govern Customs' own, independent responsibilities thereunder.  See, e.g., Tak Fat Trading Co. v. United States, 24 CIT 1376, 1379 (2000), and cases cited therein.  On the other hand, once the ITA has reached a final determination of countervailable subsidy and set a duty thereon, the responsibility of Customs is merely ministerial, simply to collect that additional amount.  See 19 C.F.R. §355.21 (1992).  And uncertainties with regard thereto are to be addressed to Commerce, not Customs, e.g., by requesting an individuated scope determination from the Department pursuant to 19 C.F.R. §355.29 (1992).  In the light of the record developed herein, such an approach would have been advisable, but the importer did not take it.

In fact, according to the statements submitted with the parties' cross-motions and quoted from above, the importer (and its surety) took no timely steps toward the ITA with regard to its countervailing-duty order prior to the protest to Customs and the appeal from its denial to this court.  By the time of this action's commencement, the underlying entries had all been liquidated (on December 14, 1994).  Then, some two years after this action had been filed, on August 1, 1997, the ITA published Leather From Argentina . . .; Final Results of Changed Circumstances Countervailing Duty Reviews, 62 Fed.Reg. 41,361, in which the

> Department determines that based upon the ruling of the
> U.S. Court of Appeals for the Federal Circuit in Ceramica

Regiomontana v. United States, 64 F.3d 1579, 1582 (Fed. Cir. 1995), it does not have the authority to assess countervailing duties on entries of merchandise covered by these orders occurring on or after September 20, 1991. As a result, we are revoking the orders on Wool, Leather, and OCTG with respect to all unliquidated entries occurring on or after September 20, 1991.

This determination was explained, in part, as follows:

The countervailing duty orders on Leather . . . from Argentina were issued pursuant to former section 303 of the Tariff Act of 1930, as amended (the Act)(repealed, effective January 1, 1995, by the Uruguay Round Agreements Act). Under former section 303, the Department could assess (or "levy") countervailing duties without an injury determination on two types of imports: (i) Dutiable merchandise from countries that were not signatories of the 1979 Subsidies Code or "substantially equivalent" agreements (otherwise known as "countries under the Agreement"), and (ii) duty-free merchandise from countries that were not signatories of the 1947 General Agreement on Tariffs and Trade (1947 GATT). . . .

When these countervailing duty orders were issued, Wool, Leather, Cold-Rolled and OCTG, were dutiable. Also, at that time, Argentina was not a "country under the Agreement" and, therefore, U.S. law did not require injury determinations as a prerequisite to the issuance of these orders.

* * *

. . . [T]he Federal Circuit . . . held, in a case involving imports of dutiable ceramic tile, that once Mexico became a "country under the Agreement" on April 23, 1985 pursuant to the Understanding between the United States and Mexico Regarding Subsidies and Countervailing Duties (the Mexican MOU), the Department could not assess countervailing duties on ceramic tile from that country under former section 303(a)(1) of the Act. . . . "After Mexico became a 'country under the Agreement,' the only provision under which ITA could continue to impose countervailing duties was section 1671." [] One of the prerequisites to the assessment of countervailing duties under 19 U.S.C. § 1671 (1988), according to the court, is an affirmative injury determination. See also Id. at §1671e. However, at the time the countervailing duty or-

der on ceramic tile was issued, the requirement of an affirmative injury determination under U.S. law was not applicable.

                        *   *   *

In Ceramica . . . the countervailing duty order on ceramic tile was issued in 1982 and Mexico did not become a country under the Agreement until April 23, 1985. Therefore, the court held that in the absence of an injury test and the statutory means to provide an injury test, the Department could not assess countervailing duties on ceramic tile and the court ordered the Department to revoke the order effective April 23, 1985 . . .. As the court stated, once Mexico became a "country under the Agreement,""[t]he only statutory authority upon which Congress could impose duties was section 1671. Without the required injury determination, Commerce lacked authority to impose duties under section 1671."

                        *   *   *

On September 20, 1991, the United States and Argentina signed the Understanding Between the United States of America and the Republic of Argentina Regarding Subsidies and Countervailing Duties (Argentine MOU). Section III of the Argentine MOU contains provisions substantially equivalent to the provisions in the Mexican MOU that were before the court in Ceramica. . . .[12]

Unfortunately for the plaintiff, this determination cannot be the basis for any relief herein. First and foremost, Customs liquidation of duties is essentially an irrevocable act. Compare 19 U.S.C. §1514(a) with §1514(b). See Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed.Cir. 1983); Cementos Anahuac del Golfo, S.A. v. United States, 13 CIT 981, 983, 727 F.Supp. 620, 622 (1989). Hence, all the retroactive relief that the ITA

_____

[12] 62 Fed.Reg. at 41,361-62 (congressional and case citations omitted). Cf. Cementos Anahuac del Golfo, S.A. v. United States, 12 CIT 401, 687 F.Supp. 1558 (1988), rev'd, 879 F.2d 847, reh'g denied, 1989 U.S. App. LEXIS 15898 (Fed.Cir. 1989), cert. denied sub nom. Cementos Guadalajara, S.A. v. United States, 494 U.S. 1016 (1990).

could grant in 1997 was with respect to "all **un**liquidated entries occurring on or after September 20, 1991".[13]

The nature of Customs liquidation also strictly circum-scribes this court's jurisdiction to grant relief.  When that jurisdiction is challenged, as the defendant does here, the burden is on the plaintiff to establish such authority.  E.g., Earth Is-land Institute v. Christopher, 19 CIT 1461, 1465, 913 F.Supp.2d 559, 564 (1995), citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992); McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936).  For purposes of this matter, the congres-sional express waiver of sovereign immunity is found in 28 U.S.C. §1581, subsections (a) and (c)[14]  of which authorize civil actions against the United States and agencies and officers thereof as follows:

---

[13] 62 Fed.Reg. at 41,361 (emphasis added).  In response to a comment by the petitioners to its published preliminary determi-nation, 62 Fed.Reg. 24,085 (May 2, 1997), the ITA emphasized that it

> no longer has jurisdiction over liquidated entries and cannot amend its liquidation instructions. . .. See, e.g., Zenith Radio Corp. v. United States, 710 F.2d 806 (Fed.Cir. 1983).  For this reason, the Department ex-pressly limited its preliminary results to all *unliqui-dated* entries occurring on or after September 20, 1991.

Id. at 41,364 (emphasis in original).

[14] The plaintiff also urges jurisdiction under 28 U.S.C. § 1581(i).  This provision cannot be invoked, however, unless the party seeking its use could not have invoked jurisdiction under 28 U.S.C. §1581(c) or shows that that primary provision was some-how "manifestly inadequate".  See, e.g., Norcal/Crosetti Foods, Inc. v. United States, 963 F.2d 356, 359 (Fed.Cir. 1992).  Here, the plaintiff does not satisfy either exception.

(a) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930.

\* \* \*

(c) The Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516A of the Tariff Act of 1930.

With such exposure to suit, Congress and the agencies responsible for administering the international trade laws, particularly after passage of the Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144 (1979), have created a regime that every importer must comply with before it may properly invoke this court's intervention. The roles of Customs and Commerce have been clearly differentiated by the 1979 act and are reflected in the foregoing subsections 1581(a) and (c).

When a good enters the United States, the importer deposits with Customs the duties that may be owed upon liquidation, which is the "final computation or ascertainment of the duties or drawback accruing on an entry." 19 C.F.R. §§ 141.101, 141.103, 159.1. In order to determine the proper amount, the port director determines the classification under the HTSUS. See 19 U.S.C. § 1202; 19 C.F.R. §152.11. If the importer disagrees with that determination, it may file a protest within 90 days. See 19 U.S.C. §1514; 19 C.F.R. §§ 174.11(b), 174.12(e). And, if Customs denies a timely protest, the importer may appeal to this court pursuant to section 1581(a), supra. On the other hand, if the importer fails

to so proceed within the 90-day limit, the duty assessed becomes "final and conclusive", foreclosing judicial review. See 19 U.S.C. §1514(a).

If there is an outstanding antidumping or countervailing-duty order, Customs, in its merely-ministerial capacity, adds and collects the appropriate duty thereunder. To repeat, since passage of the 1979 Trade Agreements Act, it has no role in determining whether such duties are appropriate and may not consider protests thereto. This is solely the province of the administrative agencies. See 19 U.S.C. ch. 4, subtitle IV. Under 28 U.S.C. §1581(c) and 19 U.S.C. §§ 1516a(a)(2)(A) and 1516a(a)(2)(B)(i) and (ii), an importer that does not believe such additional duties are appropriate may challenge the order. That is, once Customs informs the importer that duties are due under a countervailing-duty order, for example, the importer must seek relief first from the ITA. Only thereafter may it seek judicial relief, and the importer must do so within 30 days. See 19 U.S.C. §§ 1516a(a)(2)(A) and 1516a(a)(2)(B)(iv); 28 U.S.C. §1581(c).

In the matter at bar, the importer could have sought a scope review by the ITA that would have determined whether its entries were indeed implicated by its countervailing-duty order in light of the Understanding Regarding Subsidies and Countervailing Duties signed at Buenos Aires on September 20, 1991 between the United States and Argentina. By not doing so, and standing still

as the imported goods were liquidated on December 14, 1994, a challenge pursuant to 28 U.S.C. §1581(c), supra, became time-barred.

An importer or surety simply cannot, under the regulatory and relevant case law, obtain judicial review in this court "of questions relating to [countervailing] duties by challenging Customs' denial of protests to that agency's application of those orders."  Sandvik Steel Co. v. United States, 164 F.3d 596, 601 (Fed.Cir. 1998), citing Nichimen America, Inc. v. United States, 938 F.2d 1286 (Fed.Cir. 1991); Mitsubishi Electronics America, Inc. v. United States, 44 F.3d 973 (Fed.Cir. 1994).  As this court stated in Xerox Corp. v. United States, 24 CIT 1145, 1147, 118 F.-Supp.2d 1353, 1356 (2000), rev'd on another ground, 289 F.3d 792 (Fed.Cir. 2002), "what the plaintiff would in effect now have is a judicial determination ab initio of the scope of the ITA's order, but Congress has not authorized such an approach for this court any more than it has for the Customs Service."  Having failed to take advantage of and to exhaust its administrative remedies[15], the plaintiff cannot now obtain judicial relief.

_____

[15] See, e.g., McKart v. United States, 395 U.S. 185, 193 (1969), quoting Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51 (1938):

> The doctrine of exhaustion of administrative remedies . . . provides "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."

The Federal Circuit has held that to proceed otherwise would be "inappropriate".  Sandvik Steel Co. v. United States, 164 F.3d 596, 599 (1998), quoting Sharp Corp. v. United States, 837 F.2d 1058, 1062 (Fed.Cir. 1988).

                                    III

        In view of the foregoing, plaintiff's Motion for Summary
Adjudication of Issue(s) must be denied, whereas defendant's Cross-
Motion for Summary Judgment, dismissing this action, can be
granted.   Judgment will enter accordingly.

Decided:  New York, New York
          July 17, 2003

                              _____
                                        Judge